*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0476p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

COALITION TO DEFEND AFFIRMATIVE ACTION, et al.,
*Plaintiffs-Appellees,*

*v.*

JENNIFER GRANHOLM, et al.,
*Defendants-Appellees,*

MICHAEL COX, Attorney General,
*Intervenor-Defendant,*

ERIC RUSSELL,
*Intervenor-Appellant,*

TOWARD A FAIR MICHIGAN,
*Proposed Intervenor-Appellant.*

No. 06-2640

ERIC RUSSELL; TOWARD A FAIR MICHIGAN,
*Petitioners.*

No. 06-2642

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 06-15024—David M. Lawson, District Judge.

Decided and Filed: December 29, 2006

Before: SUHRHEINRICH, BATCHELDER, and SUTTON, Circuit Judges.

_____

**OPINION**

_____

SUTTON, Circuit Judge. On November 7, 2006, the people of Michigan approved a statewide ballot initiative—Proposal 2—which amended the Michigan Constitution to prohibit discrimination or preferential treatment based on race or gender in the operation of public employment, public education or public contracting in the State. Under the Michigan Constitution, the proposal was scheduled to go into effect on December 23, 2006. At stake today is whether the federal courts should permit this state initiative to go into effect or whether we should preliminarily enjoin it in part—in the part, that is, that applies to public universities and to all applicants to those universities. While the Michigan state courts remain free to suspend enforcement of Proposal 2 under state law for all manner of reasons, including those urged upon us here—uncertainty about the meaning of the law, uncertainty about the law's impact on current admissions policies and uncertainty about changing admissions policies in the middle of the current enrollment season—we are unable to identify any tenable basis under federal law for suspending the law's enforcement. The

First and Fourteenth Amendments to the United States Constitution, to be sure, *permit* States to use racial and gender preferences under narrowly defined circumstances. But they do not *mandate* them, and accordingly they do not prohibit a State from eliminating them. In the absence of any likelihood of prevailing in invalidating this state initiative on federal grounds, we have no choice but to permit its enforcement in accordance with the state-law framework that gave it birth.

I.

Legal and policy debates about admissions preferences in the university setting are not new to the people of Michigan. In 2003, the Supreme Court invalidated the University of Michigan's race-based admissions preferences in *Gratz v. Bollinger*, 539 U.S. 244, and it upheld the University of Michigan School of Law's race-based admissions preferences in *Grutter v. Bollinger*, 539 U.S. 306. In apparent response to those decisions, the Michigan Civil Rights Initiative, the executive director of which is Jennifer Gratz, the lead plaintiff in *Gratz v. Bollinger*, began a campaign to place a proposal on the state ballot that would amend the Michigan Constitution to prohibit race- and gender-based preferences in public employment, education and contracting. *See* The Michigan Civil Rights Initiative, http://www.michigancivilrights.org (last visited Dec. 26, 2006).

A.

On January 6, 2005, Gratz announced that her organization had obtained enough signatures under Michigan law to place its proposal—technically named Proposal 06-2 but commonly referred to as Proposal 2—on the statewide ballot. *See* http://www.michigancivilrights.org/media/JG-10605-remarks.pdf (last visited Dec. 26, 2006). The Michigan Board of State Canvassers eventually approved the ballot language for Proposal 2, which would amend Article I, § 26 of the Michigan Constitution if approved.

On November 7, 2006, the people of Michigan voted in favor of Proposal 2. Fifty-eight percent of the voters supported it, and 42% opposed it. *See* Michigan Department of State, 2006 Official Michigan General Election Results, http://miboecfr.nictusa.com/election/results/ 06GEN/90000002.html (last visited Dec. 26, 2006).

The constitutional amendment contains several pertinent provisions. *First*: "The University of Michigan, Michigan State University, Wayne State University and any other public college or university, community college, or school district shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." Mich. Const. art. 1, § 26.

*Second*: "The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." *Id.*

*Third*: "This section"—namely the amendment—"does not prohibit action that must be taken to establish or maintain eligibility for any federal program, if ineligibility would result in a loss of federal funds to the state." *Id.*

*Fourth*: "The remedies available for violations of this section shall be the same . . . as are otherwise available for violations of Michigan anti-discrimination law." *Id.*; *see, e.g.*, Mich. Const. art. VIII, § 2; Mich. Comp. Laws § 37.2101 *et seq.* (the Elliot-Larsen Civil Rights Act).

*Fifth*: "This section shall be self-executing. If any part or parts of this section are found to be in conflict with the United States Constitution or federal law, the section shall be implemented

to the maximum extent that the United States Constitution and federal law permit. Any provision held invalid shall be severable from the remaining portions of this section." Mich. Const. art. I, § 26.

*Sixth*: "This section does not invalidate any court order or consent decree that is in force as of the effective date of this section." *Id.*

*Seventh*: In accordance with the Michigan Constitution, the amendment was scheduled to go into effect 45 days after the election, which is to say December 23, 2006. *See* Mich. Const. art. XII, § 2.

On November 8, 2006, one day after the election, the Coalition to Defend Affirmative Action, Integration and Immigrant Rights, and Fight for Equality By Any Means Necessary, along with other organizations and individuals opposed to Proposal 2 (collectively, the "plaintiffs"), filed a lawsuit against (1) Jennifer Granholm, the Governor of Michigan, and (2) the Regents of the University of Michigan, the Board of Trustees of Michigan State University and the Board of Governors of Wayne State University (collectively, the "Universities"), seeking a declaratory judgment that the amendment was invalid and a permanent injunction against its enforcement. They filed the lawsuit in the Southern Division of the Eastern District of Michigan. In their amended complaint, plaintiffs contended that Proposal 2 violates two federal constitutional provisions (the First and Fourteenth Amendments), three federal civil rights statutes (Title VI, Title VII and Title IX) and one presidential order (Executive Order 11246). To date, plaintiffs have not independently filed a motion for a preliminary injunction or a temporary restraining order against enforcement of Proposal 2.

On December 11, the Universities filed a cross-claim against Governor Granholm, seeking (1) a declaratory judgment "that under federal law the Universities may continue to use their existing admissions and financial aid policies through the end of the current [enrollment] cycle" and (2) a preliminary injunction that "allows the Universities to continue to use their existing admissions and financial aid policies through the end of the current cycle." In support of their requests, the Universities noted that: (1) "[s]erious controversies exist regarding the validity, meaning, impact, and application of the Amendment"; (2) "[t]he Governor has requested an interpretation of the Amendment from the [state] Civil Rights Commission" in 90 days, but they cannot await the Commission's decision given the effective date (December 23) of the law; (3) "[t]he Amendment becomes effective in the midst of the Universities' current admission and financial aid cycle," which generally "run[s] from the early fall through the spring"; and (4) "[f]orcing the Universities to abandon their existing admissions and financial aid policies in the midst of this cycle would require them to apply different policies to applicants within the same cycle and different policies than they have announced" to the public.

In further support of their requests for declaratory and injunctive relief, the Universities argued that "[t]he Amendment implicates federal law." "It incorporates," they noted, "whole bodies of federal law by reference, including 'federal programs,' 'federal law,' and the 'United States Constitution.'" The Universities, they added, "put their admissions and financial aid policies in place in reliance on the Supreme Court's reaffirmation in *Grutter v. Bollinger*, 539 U.S. 306 (2003), that they have an academic freedom right, based in the First Amendment to the Constitution of the United States, to select their students and that they may, in the course of doing so, give some consideration to such factors . . . as race." On the same day, they filed a motion for a preliminary injunction, seeking the same thing—to enjoin the enforcement of Proposal 2 through the end of the current admissions cycle.

On December 14, three days after the Universities filed their cross-claim, the Michigan Attorney General, Michael Cox, filed a motion to intervene in the lawsuit. *See* Fed. R. Civ. P. 24. The district court granted the Attorney General's motion to intervene that same day.

On December 18, the three sets of parties to the cross-claim—the Governor, the Attorney General, the Universities—and the plaintiffs in the underlying action filed a stipulation with the district court, which reads in part:

> It is hereby stipulated, by and between the parties that this Court may order as follows:

> (1) that the application of Const[.] 1963, art[.] [I], § 26 to the current admissions and financial aid policies of the University parties is enjoined through the end of the current admissions and financial aid cycles and no later than 12:01 a.m. on July 1, 2007, at which time this Stipulated Injunction will expire;

> (2) that, pursuant to Fed. R. Civ. P. 41(a)(1) and 41(c), the Universities' cross-claim shall be and hereby is dismissed in its entirety, with prejudice only as to the specific injunctive relief requested in the cross-claim . . .

> . . .

Stipulation at 3.

That same day, matters grew more complicated when an individual and an interest group sought to intervene in the case. The individual was Eric Russell, a white male who has applied to the University of Michigan School of Law for admission in the fall of 2007, Affidavit of Eric Russell, at 1; the organization was Toward A Fair Michigan ("TAFM"), a non-profit entity "whose mission is to further understanding of equal opportunity issues involved in guaranteeing civil rights for all citizens," Affidavit of William Allen, at 1.

On December 19, the district court issued what it labeled a "temporary injunction." Consistent with the stipulation entered into by the Governor, the Attorney General, the Universities and the plaintiffs, the court enjoined application of Proposal 2 to the Universities' admissions and financial-aid policies until July 1, 2007, and dismissed the Universities' cross-claim. Dist. Ct. Order at 3. In essence, then, the cross-claimants dismissed their claim for an ordinary preliminary injunction in exchange for the stipulated 194-day injunction. However the injunction is labeled, it remains a preliminary injunction, albeit one of finite duration.

That same day, Russell and TAFM filed a motion urging the district court to rule on their motion to intervene by December 21 and requesting a stay of the order enjoining enforcement of Proposal 2 before its effective date—December 23.

B.

On December 21, having heard nothing from the district court on their intervention or stay motions, Russell and TAFM filed a notice of appeal to this court. The next day, they filed in this court an "Emergency Motion for a Stay Pending Appeal" of the district court's preliminary injunction and a Petition for a Writ of Mandamus directing the district court to grant their motion to intervene and to vacate its preliminary injunction.

On December 26, we issued an order giving the parties to the cross-claim (the Governor, the Attorney General, the Universities) as well as the plaintiffs in the underlying action an opportunity

to file responses to the motions by December 28.  The order also gave Russell and TAFM an opportunity to file a reply brief by December 29.  The City of Lansing, the American Civil Rights Foundation and the Michigan Civil Rights Initiative Committee each moved this court for leave to respond to Russell's motion and attached briefs to their motions.  Because the district court has now denied their motions to intervene, and the denials have not been resolved on appeal, these entities are not parties to this action.  Nonetheless, we have considered their filings as we would the filings of *amici curiae*.

On December 27, the district court ruled on the motions to intervene.  It granted Russell's motion and denied TAFM's motion both as of right and by permission.  At the same time, it denied motions to intervene filed by the City of Lansing (Michigan), the American Civil Rights Foundation and the Michigan Civil Rights Initiative Committee.  The district court has not ruled on Russell's motion for a stay pending appeal.

On December 28, Russell and TAFM filed an amended notice of appeal with respect to the preliminary injunction issued by the district court on December 19.  TAFM also appealed the denial of its motion to intervene (No. 06-2656), as did the American Civil Rights Foundation and the Michigan Civil Rights Initiative Committee (No. 06-2653) and the City of Lansing (No. 06-2658).

C.

Let us be clear that the merits of the appeal of the order granting the preliminary injunction and the appeals of the orders denying the motions to intervene are not before this panel.  In addition to the Petition for a Writ of Mandamus, the only matter presently before this panel is the motion filed by Eric Russell under his previously filed appeal, titled "Emergency Motion for a Stay Pending Appeal," asking us to stay the district court's preliminary injunction—in other words, to allow article I, section 26 of the Michigan Constitution to take immediate effect—until such time as Russell's appeal can be decided on the merits.

II.

As an initial matter, Russell plainly may challenge the validity of the preliminary injunction. He has standing to participate in the case because he has applied for admission to the University of Michigan School of Law for matriculation in 2007 and accordingly has a direct interest in whether Proposal 2 applies to the Law School's admissions decisions this year.  And he may intervene as of right in the case for one of two reasons.  Either the district court's failure to address his meritorious intervention motion before the effective date of Proposal 2 on December 23 amounted to an effective denial of the motion, which we may correct on appeal (and indeed have done so before in a similar setting), *see Americans United for Separation of Church & State v. City of Grand Rapids*, 922 F.2d 303, 306 (6th Cir. 1990), and which we may review on an interlocutory basis, *see Sales v. Marshall*, 873 F.2d 115, 120 (6th Cir. 1989).  Or the district court's order granting the intervention motion on December 27 permitted Russell to file a new notice of appeal, which he did on December 28 and which allowed him to seek immediate review of the preliminary injunction.  Either way, Russell is now a party in the case; he has filed a notice of appeal with respect to the preliminary injunction; we have jurisdiction over an interlocutory appeal from a preliminary injunction, 28 U.S.C. § 1292(a); he has filed a Motion for an Emergency Stay Pending Appeal; and we may review the stay motion in connection with our authority over the appeal of the preliminary injunction.

III.

Our standard for reviewing a motion for a stay pending appeal is a familiar one.  Much like the standard for determining whether to issue a preliminary injunction, *Baker v. Adams County/Ohio*

*Valley Sch. Bd.*, 310 F.3d 927, 928 (6th Cir. 2002) (per curiam), we consider "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991). All four factors are not prerequisites but are interconnected considerations that must be balanced together. *Id.*

A.

There are several ways to look at the likelihood that the district court's preliminary injunction order will be upheld on appeal, and each of them holds little promise that we will be able to uphold the order. *First*, the order itself does not contain a sufficient ground for prohibiting Proposal 2 from going into effect. By its terms, the order rests on two grounds: (1) "a stipulation from all parties to the case"—which at that time included the plaintiffs in the underlying action, the Universities, the Governor and the Attorney General—"consenting" to the preliminary injunction sought by the Universities, and (2) the court's conclusion "that the interests of all parties and the public are represented adequately" by these parties. Order at 3. The order does not contain any discussion of the federal-law grounds for granting an injunction. It does not contain any evidentiary findings concerning the need for immediate relief. And it does not address the four factors for granting a preliminary injunction: the Universities' likelihood of success on the merits of their cross-claim; the risk of irreparable injury to affected parties with or without the preliminary injunction; and the public interest. *See Six Clinic Holding Corp. II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399 (6th Cir. 1997) ("requir[ing]" a district court "to make specific findings concerning each of the four factors"); *United States v. Sch. Dist. of Ferndale, Mich.*, 577 F.2d 1339, 1352 (6th Cir. 1978) (vacating district court's preliminary-injunction ruling because among other reasons the district court "failed to make an express finding as to probability of success on the merits").

Whether stipulated injunctions concerning the federal constitutionality of a state law—indeed a state constitutional amendment—are a good idea, bad idea or even a permissible idea need not detain us in gauging the merits of this stay motion. *See Evans v. City of Chicago*, 10 F.3d 474, 479 (7th Cir. 1993) (en banc) (plurality opinion) ("[T]he court must ensure that there is a substantial federal claim, not only when the decree is entered but also when it is enforced, and that the obligations imposed by the decree rest on this rule of federal law rather than the bare consent of the office holder."); *League of United Latin American Citizens v. Clements*, 999 F.2d 831, 846 (5th Cir. 1993) (en banc) ("Courts must be especially cautious when [state officials] seek to achieve by consent decree what they cannot achieve by their own authority."); *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983) ("Judicial approval . . . may not be obtained for an agreement which is . . . contrary to the public interest."). The fact remains that this stipulated injunction was flawed on its own terms. From the day it was entered (December 19), it could not be said that the injunction furthered "the interests of all parties and the public." By December 18, it was clear that at least one member of the public (Eric Russell) did not support the suspension of Proposal 2 because by then he (and others) had filed a motion to intervene as of right in the lawsuit precisely because he (and others) disagreed with the parties' stipulated injunction—in his case because it would jeopardize his efforts to gain admission to the Law School in the 2007 first-year class.

Subsequent events confirm that the stipulated injunction did not account for the concerns of all interested parties—namely, the district court's December 27 order granting Russell intervention as of right. Intervention Order at 15; *see* Fed. R. Civ. P. 24(a) (requiring intervention as of right when the individual has "an interest" in the case and "is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties"). In permitting Russell to intervene as a party in the case, the trial court concluded that his "individual interest . . . *may not* be

taken into account by the present parties." Intervention Order at 15 (emphasis added). That seems to be an understatement. The parties knew of Russell's opposition to the stipulated injunction, to say nothing of the opposition to the injunction by other interested groups seeking to intervene in the case (including the proponent of Proposal 2), and nonetheless proceeded to seek its entry. Even now, the closest they have come to accounting for his interests in the case is to say that "he is free to reapply" if the Law School denies him admission this year. Universities' Br. at 38. In the final analysis, the only articulated basis provided for the injunction—that it furthered "the interests of all parties and the public"—is not true and thus does not suffice to sustain the injunction.

*Second*, even if we look behind the court's December 19 order to the Universities' cross-claim and motion for a preliminary injunction, these filings do not supply a basis for enjoining the law on the ground that it violates federal constitutional or statutory law. Most of these pleadings deal with irreparable-harm and public-interest arguments: the difficulty of changing admissions and financial-aid policies in the midst of an enrollment cycle, uncertainty over the meaning of the amendment under state law and the delay that will occur before the Michigan Civil Rights Commission acts on the Governor's request to interpret the amendment within 90 days—all good-faith reasons for seeking delay, to be sure, but none of them pertinent to establishing a federal ground for suspending the law. As to that point, the Universities' request for a preliminary injunction says just one thing—that they have a First Amendment right to continue using race- and gender-based preferences. (More on that argument later.) The salient point, however, is that the request for a stipulated injunction was not premised on any agreement, or even suggestion, that Proposal 2 violated any federal law—constitutional or otherwise. That of course is because the Attorney General has taken the position that Proposal 2 is perfectly constitutional and the Governor has not yet taken any position on the issue.

Also unhelpful is the Universities' position that the federal courts should "determin[e] their rights and responsibilities under the Amendment" and delay the effective date of the law until that task has been completed. Cross-Claim at 5. This suggestion looks at the problem through the wrong end of the lens. State courts and state agencies (such as the Michigan Civil Rights Commission) generally get the first (and ultimately the last) crack at interpreting a state law—which is why uncertainty over the meaning of a state law often counsels in favor of a federal court staying its hand until the state courts have had a chance to construe the law. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941). We know of no authority (and none has been supplied to us) saying that uncertainty over the meaning of a state law by itself supplies a basis for a federal court to suspend the law's effective date.

That the meaning of the amendment could be affected by the meaning of certain federal statutes, as the Universities also complained, does not change matters. Cross-Claim at 4. The Universities never explained what those federal laws were or exactly how they would affect the meaning of the amendment. But even if the Universities had suggested, say, that Title VI of the Civil Rights Act of 1964 might conflict with Proposal 2 under certain constructions of the amendment and certain constructions of Title VI, that would not give a federal court license to suspend the amendment. One would first want to know how the State was implementing the amendment before undertaking the task of determining whether that interpretation conflicted with some yet-to-be-determined construction of Title VI.

All of this is prelude to the most unusual feature of the stipulated injunction: the premise for granting it no longer exists. The Universities filed a cross-claim against the Governor (and effectively the Attorney General once he had intervened) seeking a declaration of "their rights and responsibilities" under Proposal 2 and a preliminary injunction until that had been done. But in return for the Attorney General's and Governor's stipulating to a preliminary injunction, the Universities agreed to dismiss the request for declaratory relief. So while the district court has

suspended the effective date of the law, it no longer has the Universities' request (or any other request) before it for declaring the Universities' "rights and responsibilities" under the amendment—or for that matter any other explanation for enjoining the law, save for the fact that some interested parties want it stayed.

In view of this point, it puzzles us that the Attorney General, who stipulated to the entry of the preliminary injunction, now contends that we lack jurisdiction to entertain a motion to stay it. Why? Because, he says, the Universities' underlying cross-claim has now been dismissed and because the district court did not permit Russell to become a party to the case until after that dismissal. But of course Russell was allowed to intervene in the "action," Fed. R. Civ. P. 24(a), not a cross-claim, and that action is alive and well. The Attorney General, moreover, seems to ignore what would seem to be a corollary to his proposed interpretation of this sequence of events—namely that if the cross-claim had already been dismissed, there would no longer be any basis for a preliminary injunction, *see supra*, and the district court could not have undertaken the necessary inquiry into the parties' likelihood of success on the cross-claim, much less found that any such probability of success existed.

*Third*, the responses to the stay motion filed in our court by the four sets of parties to the stipulated injunction—the Governor, the Attorney General, the Universities and the plaintiffs in the underlying action—also do not support the injunction. While all four of them argue extensively about the hardships of complying with the law in the middle of the 2006-2007 admissions cycle, they do not offer tenable explanations for suspending Proposal 2 on the basis of federal law.

Far from raising doubts about the validity of the amendment under federal law, the Attorney General thoroughly explains why it *does not* violate the Federal Constitution or any federal statutes. While the Governor does not expressly defend the validity of the amendment in her appellate papers, neither does she say that it violates any federal law.

**The First Amendment.** In their response to the stay motion, the Universities argue that the amendment violates the First Amendment, specifically the Universities' right to select a diverse student body in the name of academic freedom. But it is one thing to defer to a state university's judgment in deciding who may attend that university—and to defer in the process to the university's academic freedom that "long has been viewed as a special concern of the First Amendment," *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978) (opinion of Powell, J.)—in determining whether the university has run the gauntlet of defending presumptively unconstitutional racial classifications. It is quite another to say that the First Amendment in general and academic freedom in particular prohibit a State from eliminating racial preferences. Were it otherwise, as Russell points out, "state laws requiring colleges to give preferences to state residents or to admit those in the top 10% of their high school classes" would routinely violate the First Amendment. Stay Motion at 17.

The Universities mistake interests grounded in the First Amendment—including their interests in selecting student bodies—with First Amendment rights. It is not clear, for example, how the Universities, as subordinate organs of the State, have First Amendment rights against the State or its voters. *See, e.g., Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. 518, 629 (1819). One does not generally think of the First Amendment as protecting the State from the people but the other way around—of the Amendment protecting individuals from the State. After all, *Bakke*, *Grutter* and *Gratz*—the lead cases upon which the Universities rely in claiming that Proposal 2 violates the First Amendment—involved constitutional challenges by individuals against States (or at least state officials). Even then, the States' invocation of the First Amendment in those cases hardly shows that the First Amendment trumps the Fourteenth. In *Bakke* and *Gratz*, the Court *invalidated* the racial preferences contained in the schools' admissions programs under the Equal Protection Clause. And

while *Grutter* upheld the School of Law's use of racial classifications in making its admissions decisions, that was not because the First Amendment compelled it to do so. *Grutter* addresses academic freedom in the context of asking whether "the Law School's use of race is justified by a compelling state interest," 539 U.S. at 327, a question it answers by saying that its decision is "in keeping with our tradition of giving a degree of deference to a university's academic decisions, *within* constitutionally prescribed limits." *Id.* at 328 (emphasis added); *see Bakke*, 438 U.S. at 311–12 (opinion of Powell, J.) (stating that "the attainment of a diverse student body" is "a constitutionally permissible goal for an institution of higher education"). One of those "constitutionally prescribed limits," however, is the separate requirement of narrow tailoring—an inquiry that no one maintains may be satisfied simply by invoking a university's legitimate, but hardly dispositive, interest in academic freedom.

In discussing the narrow-tailoring requirement, moreover, *Grutter* urged universities to look to States that had eliminated the use of race in making admissions decisions to determine whether race-neutral ways of furthering the universities' interests in a diverse student body existed. *See* 539 U.S. at 342 ("Universities in California, Florida, and Washington State, where racial preferences in admissions are prohibited by state law, are currently engaged in experimenting with a wide variety of alternative approaches. Universities in other States can and should draw on the most promising aspects of these race-neutral alternatives as they develop."). If, as the Universities maintain, the First Amendment prohibits States from eliminating racial preferences in admissions, one would not expect the Court to urge universities to consider the efficacy of state laws doing just that. No less strange, *Grutter* ends by explaining that affirmative action programs may not exist in perpetuity. Noting that it has been 25 years since *Bakke*, it remarked that "[w]e expect that 25 years from now, the use of racial preferences will no longer be necessary to further the interest approved today." *Id.* at 343. The First Amendment, by contrast, has no termination point, whether in 25, 50 or 250 years, making it improbable that the same Court that decided *Grutter* would hold that state universities have a First Amendment right to maintain racial preferences.

**The Equal Protection Clause**. The plaintiffs in the underlying action offer a host of other arguments for sustaining the preliminary injunction. In addition to invoking the First Amendment, they claim that the amendment likely violates the Equal Protection Clause of the Fourteenth Amendment. We do not agree.

In contending that the Equal Protection Clause compels what it presumptively prohibits, plaintiffs face a steep climb. The Clause prevents "official conduct discriminating on the basis of race," *Washington v. Davis*, 426 U.S. 229, 229 (1976), and on the basis of sex, *United States v. Virginia*, 518 U.S. 515 (1996), not official conduct that bans "discriminat[ion] against" or "preferential treatment to" individuals on the basis of race or sex—as Proposal 2 does.

If "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality," *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943), and if racial distinctions "threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility," *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (citations omitted), a state constitutional amendment designed to eliminate such "distinctions" in state government would seem to be an equal-protection virtue, not an equal-protection vice. After all, the "color-blind" goal of the Equal Protection Clause, *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting), is "to do away with all governmentally imposed discrimination based on race," *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984) (citation and footnote omitted), making it difficult to understand how the same constitutional provision could prohibit a State from doing away with race- and sex-based classifications sooner rather than later. *See Crawford v. Bd. of Educ. of the City of Los Angeles*, 458 U.S. 527, 538–39 (1982) ("[T]he Equal

Protection Clause is not violated by the mere repeal of race-related legislation or policies that were not required by the Federal Constitution in the first place.").

*Grutter*, it is true, says that States still may use racial classifications as a factor in school admissions when they can establish a compelling interest for doing so and when they can satisfy the demanding requirements of narrow tailoring. But *Grutter* never said, or even hinted, that state universities *must* do what they narrowly *may* do. Otherwise: the Court would not have directed state universities to look to "[u]niversities in California, Florida, and Washington State, where racial preferences in admissions are prohibited by state law," to "draw on the most promising aspects of these race-neutral alternatives as they develop," 539 U.S. at 342; it would not have quoted in the next line of the opinion Justice Kennedy's concurrence in *United States v. Lopez*, 514 U.S. 549, 581 (1995), to the effect that "the States may perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear"—such as looking for race-neutral methods of seeking diverse student bodies, *Grutter*, 539 U.S. at 343; and it would not have said that "[w]e expect that 25 years from now, the use of racial preferences will no longer be necessary to further the interest approved today," *id.* Surely a State may offer more equal protection than the Fourteenth Amendment requires, *see Oregon v. Hass*, 420 U.S. 714, 719 (1975) ("a State is free *as a matter of its own law* to impose greater restrictions . . . than those this Court holds to be necessary upon federal constitutional standards"), and surely a State may end racial preferences some years before they must do so. In the end, a law eliminating presumptively invalid racial classifications is not itself a presumptively invalid racial classification.

Much the same is true of classifications based on gender. "Without equating gender classifications, for all purposes, to classifications based on race or national origin, the Court . . . has carefully inspected official action that closes a door or denies opportunity to women (or to men)." *United States v. Virginia*, 518 U.S. 515, 532 (1996) (internal footnote and citation omitted); *see J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994) ("[O]ur Nation has had a long and unfortunate history of sex discrimination, a history which warrants the heightened scrutiny we afford all gender-based classifications today.") (internal quotation marks omitted). If the Equal Protection Clause gives "heightened" scrutiny to such distinctions, a State acts well within the letter and spirit of the Clause when it eliminates the risk of any such scrutiny by removing gender classifications altogether in its admissions programs.

In taking this path, we do not walk alone. In 1997, the Ninth Circuit rejected an Equal Protection challenge to a similar proposition passed by the people of California. *See Coal. for Econ. Equity v. Wilson*, 122 F.3d 692 (9th Cir. 1997). Like Proposal 2, Proposition 209 outlawed discrimination or preferential treatment "on the basis of race, sex, color, ethnicity, or national origin" in the realms of public employment, education and contracting. Cal. Const. art. I, § 31(a). Like the plaintiffs in our case, the plaintiffs in the Ninth Circuit case argued that the state initiative denied them equal protection of the laws by burdening their right to seek the benefits of existing affirmative action programs. *See Coal. for Econ. Equity*, 122 F.3d at 705. And like the Ninth Circuit, we find these arguments unpersuasive. *See id.* at 702 ("A law that prohibits the State from classifying individuals by race or gender *a fortiori* does not classify individuals by race or gender."); *see id.* at 708 ("The controlling words, we must remember, are 'equal' and 'protection.' Impediments to preferential treatment do not deny equal protection.").

Attempting to head off this conclusion, plaintiffs contend that Proposal 2 violates their equal protection rights by placing an unfair political burden on women and minorities who "may now seek relief" in the form of the re-institution of race- and gender-based admissions preferences "only by mounting a statewide campaign to amend" the Michigan Constitution. Complaint at 17. Three Supreme Court cases, they argue, demonstrate that state and local governments may not restructure the political process to disadvantage or discriminate against minorities. *See Hunter v. Erickson*, 393

U.S. 385 (1969); *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457 (1982); *Romer v. Evans*, 517 U.S. 620 (1996).

In all three cases, however, the Court determined that the laws at issue burdened minority interests in the political process in a way that Proposition 2 does not. *Hunter* addressed an amendment to Akron's city charter requiring Akron's city council to obtain majority approval by the city before implementing housing ordinances dealing with racial, religious or ancestral discrimination. Although the provision purported on its face to treat all races equally, in "reality," the Court held, "the law's impact falls on the minority" because the "majority needs no protection against discrimination and if it did, a referendum might be bothersome but no more than that." 393 U.S. at 391. *Seattle* invoked *Hunter* to strike down a Washington State initiative preventing local school boards from using racially integrative busing. There the Court reasoned that the initiative "remove[d] authority to address a racial problem—and only a racial problem—from the existing decisionmaking body, in such a way as to burden minority interests." 458 U.S. at 474. *Romer* struck down an amendment to the Colorado constitution that prohibited local governments from acting to protect homosexuals from discrimination, an amendment that "impose[d] a special disability upon [homosexuals] alone." 517 U.S. at 631.

Unlike the laws invalidated in *Hunter*, *Seattle* and *Romer*, Proposal 2 does not burden minority interests and minority interests alone. The proposal prohibits the State from discriminating against or granting preferential treatment to individuals on the basis of "race, sex, color, ethnicity, or national origin." Mich. Const. art. I, § 26. No matter how one chooses to characterize the individuals and classes benefitted or burdened by this law, the classes burdened by the law according to plaintiffs—women and minorities—make up a majority of the Michigan population. As *Hunter* indicates, the "majority needs no protection against discrimination and if it did, a referendum might be bothersome but no more than that." 393 U.S. at 391. Unlike the *Hunter* line of cases, then, Proposal 2 does not single out minority interests for this alleged burden but extends it to a majority of the people of the State.

Even were we to consider only the law's restrictions on racial preferences, this political-process claim still would not be likely to succeed. The challenged enactments in *Hunter*, *Seattle* and *Romer* made it more difficult for minorities to obtain *protection from discrimination* through the political process; here, by contrast, Proposal 2 purports to make it more difficult for minorities to obtain *racial preferences* through the political process. These are fundamentally different concepts. The *Hunter*, *Seattle* and *Romer* decisions, moreover, objected to a State's impermissible attempt to reallocate political authority. *See Seattle*, 458 U.S. at 470 (prohibiting a government from "explicitly using the *racial* nature of a decision to determine the decisionmaking process"). Instead of reallocating the political structure in the State of Michigan, Proposal 2 is more akin to the "repeal of race-related legislation or policies that were not required by the Federal Constitution in the first place," *Crawford*, 458 U.S. at 538, an action that does not violate the Equal Protection Clause. *See generally Coal. for Econ. Equity*, 122 F.3d at 708 (reasoning that "[i]mpediments to preferential treatment do not deny equal protection").

**Title VI.** Plaintiffs next argue that Title VI of the Civil Rights Act of 1964 preempts Proposal 2. But they face several obstacles in bringing the claim. For one, the Civil Rights Act says that it may not be "construed as invalidating any provision of State law unless such provision is inconsistent with any of the purposes of this Act, or any provision thereof." 42 U.S.C. § 2000h-4. That means plaintiffs must establish a form of "conflict preemption," which is to say they must show either that "compliance with both federal and state regulations is a physical impossibility" or that "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 281 (1987) (plurality) (internal quotation marks omitted).

For another, Proposal 2 by its terms eliminates any conflict between it and federal-funding statutes like Title VI. "This section," the proposal says, "does not prohibit action that must be taken to establish or maintain eligibility for any federal program, if ineligibility would result in a loss of federal funds to the state." Mich. Const. art. I, § 26(4). And Title VI in turn says that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. What Title VI requires, in other words, Proposal 2 expressly allows—eliminating any conflict between the two laws.

Nor does Proposal 2 thwart the purposes of Title VI—"prevent[ing] discrimination in federally assisted programs." Pub. L. No. 88-352, 78 Stat. 241 (1964). Proposal 2 reinforces that goal by prohibiting state universities from discriminating, or granting preferential treatment, on the basis of race.

**Title IX**. Plaintiffs further contend that Title IX of the Education Amendments of 1972 preempts Proposal 2. This claim, too, holds little promise. Proposal 2, as shown, expressly avoids conflicts with federal-funding statutes like this one. Mich. Const. art. I, § 26(4). And by preventing discrimination on the basis of sex, Proposal 2 directly serves Title IX's objectives. *See* 20 U.S.C. § 1681 ("No person in the United States shall, on the basis of sex, be excluded from participation in, denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."). (In their complaint, plaintiffs also relied on Title VII and an Executive Order, but they have not invoked these provisions in seeking to uphold the preliminary injunction.)

B.

Having determined that Russell has a strong likelihood of reversing the district court's preliminary injunction, we must consider whether the other stay factors militate against granting a stay. They do not. The irreparable-injury factors do not meaningfully favor one set of parties over the other. To the extent plaintiffs and the Universities maintain that irreparable harm will occur to them because Proposal 2 violates their federal constitutional rights, that does not help them. As we have shown, they have little likelihood of establishing that Proposal 2 violates the Federal Constitution.

What we have instead is a situation in which irreparable harm will befall one side or the other of the dispute no matter what we do. To respect university applicants who favor preferences this year is necessarily to slight those who oppose them—putting both equally at risk of disappointment when admissions decisions are made this year. And to respect the Universities' interest in preserving their current admissions and financial-aid programs during this enrollment cycle is necessarily to slight the public interest in permitting a statewide initiative to go into effect on the date that the Michigan Constitution requires. In short, "either party will suffer an irreparable injury if we rule against it." *Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458, 460 (6th Cir. 1991). Nor can it fairly be said that Proposal 2 came as a sudden surprise to anyone. Efforts to pass the initiative began soon after the Supreme Court's decisions in *Grutter* and *Gratz*, and the initiative was passed near the beginning of the 2006-2007 admissions cycle after a long debate about the merits of it. The irreparable-harm inquiry in the end does not strongly favor one party or another.

With respect to the fourth factor, "the public interest lies in a correct application" of the federal constitutional and statutory provisions upon which the claimants have brought this claim, *id.*, and ultimately (in view of our interpretation of those provisions) upon the will of the people of Michigan being effected in accordance with Michigan law. All of this said, our decision ultimately "turn[s] on the likelihood of success on the merits," *id.*, and our conviction that these are weak

federal claims.  If we saw the merits differently, we would likely treat the stay motion differently as well.  *See Americans United*, 922 F.2d at 306.

* * * * *

Which leads us to our last point:  this is an unusual way to use the federal courts.  Ordinarily, one might wonder why a court would hesitate to delay the implementation of a state law for six months when the State's Governor, the State's Attorney General and its Universities stand together in urging its suspension.  That is particularly so when they offer reasonable administrative grounds for the delay—uncertainty about how the law will be interpreted and uncertainty about applying it during this year's enrollment cycle.  Yet none of those administrative grounds explains why the *federal courts* should delay the law's implementation on federal grounds.  And none of those administrative grounds explains why a *federal court* should suspend the law while *it* declares the Universities' "rights and responsibilities" under the new state law—given that state courts, not federal courts, have the final say on the meaning of state laws and given that the only vehicle ever presented in this case for such a declaration of rights was the Universities' cross-claim, which they voluntarily dismissed.

All of this, however, strongly suggests that if an interim injunction should be granted in this case, it is the state courts, not the federal courts, that should grant it.  The state courts assuredly have authority to delay the law's implementation during this enrollment cycle—either because the meaning of the law is unclear or because it will be administratively onerous to apply it immediately. If, as the state parties have maintained throughout this litigation, a stipulated injunction accounts for the concerns of all interested parties and the people of Michigan, one can rest assured that the state courts will see it that way as well.  But if the state courts do not see it that way, that proves only that there is another side to the story, one that the federal courts should be prepared to respect.

IV.

For these reasons, the motion for a stay pending appeal of the district court's preliminary injunction is granted, and the petition for a writ of mandamus is dismissed as moot.