RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0266p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JOEL CROOKSTON,

*Plaintiff-Appellee,*

    *v.*

RUTH JOHNSON, Michigan Secretary of State, in her official capacity,

*Defendant-Appellant.*

No. 16-2490

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids
No. 1:16-cv-01109—Janet T. Neff, District Judge.

Decided and Filed: October 28, 2016

Before: COLE, Chief Judge; GUY and SUTTON, Circuit Judges.

_____

SUTTON, J., delivered the decision of the court in which GUY, J., joined. GUY, J. (pp. 7–8), delivered a separate concurrence. COLE, C.J. (pp. 9–13), delivered a separate dissent.

---

**ORDER**

---

SUTTON, Circuit Judge. One hundred and twenty-five years ago, Michigan enacted a law designed to protect the secret ballot by forbidding voters from exposing their marked ballots to others. Nine years ago, Apple introduced a cell phone capable of taking photographs and uploading them to the Internet. Thirty-two days ago, Joel Crookston sought a preliminary injunction to prevent the State from enforcing the Michigan law in the upcoming election so that he could take a "ballot selfie" with his cell phone and post it on social media. Four days ago, the district court granted his motion, which state officials immediately asked us to stay.

Timing is everything. Crookston's motion and complaint raise interesting First Amendment issues, and he will have an opportunity to litigate them in full—after this election.

1

With just ten days before the November 2016 election, however, we will not accept his invitation to suddenly alter Michigan's venerable voting protocols, especially when he could have filed this lawsuit long ago. For these reasons and those below, we grant the Secretary of State's motion to stay the district court's preliminary injunction.

On November 6, 2012, Crookston took a picture of his completed ballot for the Michigan State University Trustee election, where he had written in the name of a former college classmate, and posted the picture on Facebook. Nearly four years later, with another, slightly bigger election approaching, Crookston filed this lawsuit to vindicate his right to post another "ballot selfie"—this time with his completed ballot for the state and federal elections on November 8, 2016.

One premise of Crookston's lawsuit is correct. Michigan law forbids him from taking a picture of his marked ballot at one of the State's polling places and sharing it on social media. In general elections, Michigan provides that, "[i]f an elector shows his or her ballot . . . to any person other than a person lawfully assisting him or her . . . or a minor child accompanying that elector . . . after the ballot has been marked . . . the ballot shall not be deposited in the ballot box, but shall be marked 'rejected for exposure' . . . . [A] note of the occurrence shall be entered on the poll list . . . and the elector shall not be allowed to vote at the election." Mich. Comp. Laws § 168.738(2). The Secretary of State has issued instructions to local election officials banning "the use [of] video cameras, cell phone cameras or video recording, cameras, television [and] recording equipment . . . in the polling places," with a limited exception for the news media. R. 1 at 5.

The district court granted Crookston's motion to enjoin the enforcement of these rules in the November election, and it denied the Secretary's request for a stay of that order. The Secretary sought an emergency stay of the preliminary injunction from our court.

When faced with a motion for a stay pending appeal, we consider (1) the likelihood that the party seeking the stay will prevail on the merits; (2) the likelihood that the moving party will be irreparably harmed; (3) the prospect that others will be harmed by the stay; and (4) the public interest in the stay. *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006).

There are many reasons to grant the stay. The first and most essential is that Crookston offers no reasonable explanation for waiting so long to file this action. When an election is "imminen[t]" and when there is "inadequate time to resolve [] factual disputes" and legal disputes, courts will generally decline to grant an injunction to alter a State's established election procedures. *See Purcell v. Gonzalez*, 549 U.S. 1, 5–6 (2006) (per curiam). That is especially true when a plaintiff has unreasonably delayed bringing his claim, as Crookston most assuredly has. *See Operating Engineers Local 324 Health Care Plan v. G & W Constr. Co.*, 783 F.3d 1045, 1053 (6th Cir. 2015); *Nader v. Blackwell*, 230 F.3d 833, 835 (6th Cir. 2000); *Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980). Call it what you will—laches, the *Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so.

No such reason appears here. The challenged rules are not new. Michigan's ban on ballot exposure dates to 1891, and today's version of these laws has been on the books since 1996. Even Crookston cites a news story showing that the Secretary's ban on recording devices at the polls has been in place since (at least) 2008. And his own complaint acknowledges that the Secretary posted notice of the ban on her website in October 2014. Nor did Crookston just acquire a cell phone or just become eligible to vote, as his 2012 ballot selfie confirms. Yet Crookston chose to wait until September 9, 2016 to challenge the rules, and did not move for a preliminary injunction until September 26.

Crookston offers no explanation for his delay—other than what he calls the "reasonable" likelihood that the Secretary would construe the statutes to permit ballot selfies. Appellee's Br. 7. But what makes that possibility reasonable he never says. Best we can tell, he means only that it is always possible for the Secretary to make election-protocol changes. If that reality sufficed to justify a delay of litigation, however, we would be encouraging sluggish election-procedure challenges rather than deterring them—just the opposite of the *Purcell* principle. Crookston offers no proof that the Secretary was considering any such changes or that anyone asked her to make them. All of this should impress on Crookston, and other would-be challengers to election protocols, the need to bring as-applied (and for that matter facial) challenges sooner rather than later—first to give election officials an opportunity to make corrections where corrections are due and second to give district and appellate courts ample time

to resolve the merits of the dispute long before the election. A manufactured emergency does not warrant emergency relief.

Crookston's belated challenge to Michigan's election procedures prejudices the State's interest in holding orderly elections. Michigan has a large and decentralized election system. It has already completed the key training events for the November election and the 30,000 poll workers needed to run it. In that training, the Secretary instructed poll workers to enforce the photography ban in order to maintain order in the polling place and to protect the secrecy of the ballot. The Secretary has also distributed a "how to" manual for poll workers that includes the photography ban. Changing the policy now is a recipe for election-day confusion for voters and poll workers alike.

Any such change also would require nuanced policy decisions that no one should be making at the eleventh hour—absent a good explanation for the delay. Crookston seems to assume that Michigan's voting stalls provide complete privacy and that a selfie-taker would not disturb any other voters or capture *their* votes on the camera. But many Michigan voting stalls, as the State has explained and as Crookston has not denied, are simply tall desks, placed next to each other, with three short dividers shielding the writing surface from view. In this setting, posing for a ballot selfie could compromise the secrecy of another's ballot, distract other voters, and force a poll worker to intervene. Absent the best of reasons, not remotely presented here, elections officials should not have to disseminate a new, difficult-to-implement policy to 30,000 poll workers in the week before a presidential election. On this record, the tardiness of Crookston's motion for a preliminary injunction alone requires us to reject it.

But we are skeptical as well of the district court's assessment of Crookston's odds of success on the merits. The Secretary's ban on photography at the polls seems to be a content-neutral regulation that reasonably protects voters' privacy—and honors a long tradition of protecting the secret ballot. *See Connection Distrib. Co. v. Holder*, 557 F.3d 321, 328 (6th Cir. 2009) (en banc). And even if the ballot-exposure ban is not content neutral, the Supreme Court has upheld content-specific speech restrictions in polling places before, either because the State can further its compelling interests in protecting "the right of its citizens to vote freely" in an election "conducted with integrity and reliability" through "reasonable" voting regulations that do not "significantly impinge" on First Amendment rights, *Burson v. Freeman*, 504 U.S. 191,

198–99 (1992) (plurality), or because a polling place is not a traditional public forum, *id.* at 216 (Scalia, J., concurring). In *Burson*, the Court upheld a longstanding ban on electioneering within 100 feet of a polling place, *id.* at 193 (plurality), a policy with many parallels to this one.

The State's policy advances several serious governmental interests: preserving the privacy of other voters, avoiding delays and distractions at the polls, preventing vote buying, and preventing voter intimidation. Crookston tries to minimize the risk of vote buying as a relic of a bygone electoral era. But plenty of cases—in this circuit alone—show otherwise. *See United States v. Robinson*, 813 F.3d 251, 254 (6th Cir. 2016) (affirming a vote-buying conviction); *United States v. Turner*, 536 F. App'x. 614, 615 (6th Cir. 2013) (same); *United States v. Young*, 516 F. App'x. 599, 600–01 (6th Cir. 2013) (same). The links between these problems and the prohibition on ballot exposure are not some historical accident; they are "common sense." *Burson*, 504 U.S. at 207. At the same time, it is far from clear that Crookston's proposal creates no risk of delay, as ballot-selfie takers try to capture the marked ballot and face in one frame—all while trying to catch the perfect smile.

Nor do we think much of Crookston's argument that the State has offered no evidence of ballot photography being used in vote-buying schemes or to intimidate voters. The Supreme Court made quick work of a similar argument in *Burson*. "The fact that these laws have been in effect for a long period of time," it reasoned, "makes it difficult for the States to put on witnesses who can testify as to what would happen without them." *Id.* at 208; *see also id.* at 214–16 (Scalia, J., concurring). Just so here.

It also is not clear whether a ban on ballot selfies "significantly impinges" Crookston's First Amendment rights. A picture may be worth a thousand words, but social media users can (and do) post thousands of words about whom they vote for and why. Although the loss of any potential First Amendment freedom deserves serious consideration, the government's interests in a stay outweigh any imposition on the expressive rights of Crookston and other would-be selfie-takers—particularly given the privacy interests of *other* voters in not having *their* votes made public.

As the Secretary has repeatedly made clear, moreover, there is no risk that Crookston or anyone else will be fined or face jail time for sharing photographs of their ballots. The Secretary has indicated that she will not prosecute anyone for such violations. Instead, with a hint of

Solomonic wisdom, the law declares that violators will face one penalty: the vote they wanted the world to see will not count.

We recognize, to be sure, that other courts have struck down similar laws in thoughtful opinions. *See Rideout v. Gardner*, __ F.3d __, 2016 WL 5403593 (1st Cir. 2016); *Ind. Civil Liberties Union Found. v. Ind. Sec'y of State*, No. 1:15-cv-01356, 2015 WL 12030168 (S.D. Ind. Oct. 19, 2015). But these decisions concerned laws that were targeted at ballot selfies, not general bans on ballot-exposure and photography at the polls. And, most importantly, these lawsuits did not seek to enjoin longstanding statutes on the eve of a presidential election. One was filed 728 days before the next major election. *Rideout*, 123 F. Supp. 3d at 227. The other was filed two months after the legislature enacted the law. *Ind. Civil Liberties Union*, 2015 WL 12030168, at *1.

To be clear, we are not resolving the merits of the case. Lingering issues remain, some of which may require evidence, including the interrelation of this ban with other Michigan voting procedures, including the use of mail-in ballots. There will be time enough for that after the election. So far, the district court has not held a hearing, and as a result has not made any factual findings. Were it possible to weigh all of these factors fairly in the time allotted, we would have little reason to be critical of Crookston's delay in filing the lawsuit. But the schedule Crookston forced upon the court did not even allow sufficient time for a hearing, much less the careful consideration these questions deserve.

Our opinion, it bears adding, will not render this case moot. Crookston seeks to vindicate this right in this year's election and future elections. That means he will be able to pursue his claim after the election, when there will be time for due deliberation in the district court and our court.

For these reasons, we grant the motion for a stay of the preliminary injunction.

———————

**CONCURRENCE**

———————

GUY, J., concurring. I concur completely in Judge Sutton's opinion, but write separately to address that part of our review which involves consideration of the plaintiff's likelihood of success on the merits. Specifically, I want to address the issue of delay. To begin with there was no hearing in the district court on this issue so the State has had no opportunity to present evidence.

The turnout at the upcoming election is expected to be one of the largest in history. Long lines at many polling places in Michigan are anticipated. In past years, the federal courts in Michigan have been called upon to issue orders requiring the polls to be kept open after normal closing hours. In some cases the wait for persons seeking to vote has exceeded two hours. Depending on location, some waiting in line have to wait outdoors and, given the time of year, in inclement weather. The result, as least as claimed by those who have sought the assistance of the federal courts in the past, has been that persons don't wait, but leave and simply give up their right to vote. Small delays multiplied over time can result in longer delays.

This raises the question of how much delay does taking a selfie cause? There is no easy answer to that question. If one just points the camera at a spot on the ballot and takes a picture this obviously would take little time. If all a person wants is a picture of the ballot that can be done by securing a sample ballot and taking a picture of it. But that is not a selfie for the obvious reason that there is no "self." As to how many might avail themselves of the opportunity to take a selfie, I don't really know. But I do know that the number of persons who feel compelled to record their every waking moment and broadly share it with others is immense.

There are many different methods used in Michigan for recording votes. Among others there are voting machines, punch cards, and paper ballots where one fills in an oval next to the candidate's name. Some voting spaces are private with a curtain of some kind. Others are open. If one wants to take a picture of himself or herself taking a selfie which picture also includes the ballot in the photo, it is not an easy task. Also, with digital photography, if you don't like the way you look in the first one, you take another and so on *ad infinitum.* Does the allowance of taking a selfie also include use of the ubiquitous selfie stick?

I raise these issues because the state never really had an opportunity to do so. That is one of the main reasons why I join the opinion granting a stay. Insofar as injury to the public is concerned, all I can say is that the statute in question has been on the books since 1891 and up until now no one has ever claimed to have been injured by it. The constitution hasn't changed in that time, but technology has. Whether that change compels the State to turn a voting booth into a photo booth remains to be seen.

_____

**DISSENT**

_____

COLE, Chief Judge, dissenting. As millions of Americans across the country prepare to vote, their counterparts in the state of Michigan will be put in the position of choosing between their freedom of expression and their right to vote. The penalty in Michigan for taking a ballot selfie is the loss of one's right to vote. In permitting the loss of such a fundamental right, the majority puts the administrative interests of the state above the individual rights of the citizens of Michigan.

The majority misapplies the standard for granting a motion to stay. When an appellate court considers a stay pending appeal, it must consider:

> (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay.

*Coalition to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006) (internal quotation marks and citations omitted). "All four factors are not prerequisites but are interconnected considerations that must be balanced together." *Id.* "The strength of the likelihood of success on the merits that needs to be demonstrated is inversely proportional to the amount of irreparable harm that will be suffered if a stay does not issue." *Baker v. Adams Cty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 928 (6th Cir. 2002).

In the matter at hand, the district court issued a preliminary injunction and denied the Secretary's stay motion. A stay of the district court's ruling is only warranted when a defendant has demonstrated "at least serious questions going to the merits and irreparable harm that decidedly outweighs the harm that will be inflicted on others if a stay is granted." *Id.* The Secretary has failed to make this showing.

### I.  Likelihood of Success on the Merits

Crookston will likely prevail on the merits of this appeal, because the district court correctly concluded that the Michigan laws and instructions that prevent ballot selfies violate the

First Amendment of the United States Constitution. All the other courts, including the only other circuit to have considered this issue, have found that laws banning ballot selfies are unconstitutional. *See Rideout v. Gardner*, No. 15-2021, 2016 WL 5403593 (1st Cir. Sept. 28, 2016); *Indiana Civil Liberties Union Found. Inc. v. Indiana Sec'y of State*, No. 115CV01356SEBDML, 2015 WL 12030168 (S.D. Ind. Oct. 19, 2015).

The First Amendment prohibits the government from passing laws that abridge the freedom of speech. U.S. Const. amend. I. Courts apply varying levels of scrutiny depending on whether the First Amendment restrictions at issue are content-based restrictions or content-neutral restrictions. If the restrictions are content based, "the law must survive strict scrutiny." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty., Tennessee*, 274 F.3d 377, 391 (6th Cir. 2001). "In contrast, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny." *Id.*

Because Michigan's restrictions fail even intermediate scrutiny, I need not resolve whether these restrictions are content based or content neutral. The First Circuit in evaluating similar restrictions also declined to decide whether the restrictions were content based because it found New Hampshire's restrictions could not survive the lower threshold of intermediate scrutiny. *See Rideout v. Gardner*, No. 15-2021, 2016 WL 5403593, at 13 (1st Cir. Sept. 28, 2016). In order for the laws and instructions at issue to withstand intermediate scrutiny, they have to be "narrowly tailored to serve a significant governmental interest, and [] leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

The Secretary has not provided any evidence to show that the problems these laws and instructions were meant to address actually exist in Michigan today. The Secretary argues that Michigan's restrictions address the important government interests of (1) discouraging "vote-buying and coercion by ensuring that ballot content is not exposed," (2) ensuring "that the polling place is a sanctuary for all—not just some—voters," and (3) preventing "the delays that may occur while the voting booth is occupied or access to the tabulator is blocked by voters taking photos or recording the voting process." (Def.'s Emergency Mot. for Stay at 18, 20, and 22.) While all of these may be government interests in the abstract, there is disproportionality between the interests stated and the ballot selfie prohibition created by these laws and

instructions. The Secretary provides no evidence to prove that any of these interests actually present a problem in Michigan at the moment. The Secretary explains this failure of evidence by stating that these long-standing restrictions have acted as prophylactic measures that have successfully prevented each of these problems from arising. (*Id.* at 19.) The Secretary's argument flips the state's burden. When a state infringes upon the freedom of speech of its citizens, it cannot simply assert a government interest in the abstract, it must show that those interests exist and are actually served by the prohibitions imposed by the state. *See Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 810 (1984).

Even if the state had provided evidence from this century that digital photography at polls has created the problems listed above, Michigan's laws and instructions would still be unconstitutional because they are not narrowly tailored to the government interests asserted. In order to be narrowly tailored, a regulation must "promote[] a substantial government interest that would be achieved less effectively absent the regulation, and does not burden substantially more speech than is necessary to further the government's legitimate interests." *Tucker v. City of Fairfield, Ohio*, 398 F.3d 457, 463 (6th Cir. 2005) (internal quotation marks and citations omitted). The tailoring requirement prevents the government from taking the "path of least resistance" and sacrificing "speech for efficiency." *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014). The First Circuit's analysis of New Hampshire's similar laws provides helpful guidance on the issue of tailoring. The First Circuit found that New Hampshire had not narrowly tailored its laws because "the prohibition on ballot selfies reaches and curtails the speech rights of all voters, not just those motivated to cast a particular vote for illegal reasons," and New Hampshire "has not demonstrated that other state and federal laws prohibiting vote corruption are not already adequate to the justifications it has identified." *Rideout v. Gardner*, No. 15-2021, 2016 WL 5403593, at 18 (1st Cir. Sept. 28, 2016) (citing federal statutes that prohibit vote buying, voter coercion, and voter intimidation). The First Circuit's rationale holds as strongly for Michigan's prohibitions as it does for New Hampshire's.

The majority says that the Supreme Court's decision in *Burson v. Freeman*, 504 U.S. 191 (1982) dampens Crookston's likelihood of success on the merits. As the First Circuit already pointed out, *Burson* is distinguishable from this case because "[t]he intrusion on the voters' First Amendment rights is much greater here than that involved in *Burson*." *Id.* at 17. The

government's responsibility to narrowly tailor its restrictions is even more critical where there is a greater burden. Michigan's laws and instructions banning ballot selfies substantially burden more speech than is necessary to further the government's stated interests. As such, the laws and rules are not narrowly tailored and are therefore unconstitutional.

## II. *The Likelihood that the Moving Party will be Irreparably Harmed Absent a Stay*

The majority, in granting the stay, relies on the proximity to the election and the Secretary's argument that Michigan would be unable to convey the change to their poll workers prior to the election. While these are legitimate concerns, relying on them without balancing the constitutional burdens faced by the plaintiff and other similarly situated voters fails to properly balance the factors for a stay.

While the election is fast approaching, the administrative changes required by the preliminary injunction are not so onerous that they rise to the level of irreparable harm. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough" to reach the level of irreparable harm. *Sampson v. Murray*, 415 U.S. 61, 90 (1974). The Secretary, in her motion, argues that a change in the law, at this time, will create "chaos" on election day. (Def.'s Emergency Mot. for Stay, 30.) The Secretary, however, is only required to convey to election officials that they will *not* be voiding ballots when voters take ballot selfies. It does not require a new set of procedures; rather it only requires communication to the various polling officers and polling sites. This may not be as simple as an email, as the Secretary has noted, but does not rise to the level of irreparable harm. It requires some additional expenditure of time and resources but, as the Supreme Court has stated, that is not enough to meet the standard for irreparable harm.

Further, this is not an issue akin to reprinting ballots, where there is a chance that there will not be enough time before the election to inform poll workers of the change in law. As of the date of this order, there are still ten days left before election day, plenty of time to convey this change to poll workers.

The Supreme Court's per curiam decision in *Purcell v. Gonzalez*, 549 U.S. 1 (2006), is easily distinguishable because the district court in *Purcell* failed to provide timely findings of fact to the court of appeals. That is not the case here. The district court, after reviewing

affidavits and other factual exhibits provided by the parties, here included findings of fact in its October 24, 2016 Opinion. These factual findings are naturally limited as they were issued on a motion for preliminary injunction rather than after a full merits hearing but address the main concern articulated in *Purcell*. Consequently, the majority's reliance on *Purcell* does not demonstrate the irreparable harm needed under the applicable factors.

### III. The Prospect that Others will be Harmed if the Court Grants the Stay

The repercussion of taking a ballot selfie in Michigan is the loss of one's right to vote. Consequently, this likely unconstitutional law will deprive many of the citizens of Michigan of their right to vote in this election if they exercise their First Amendment right to take a ballot selfie. This is one the highest levels of harm that could result from a law. It is, quite simply, the loss of a fundamental right.

### IV. The Public Interest in Granting the Stay

As the district court accurately points out, there can be no public interest in allowing Michigan to violate the constitutional rights of its citizens. (District Ct. Order, R. 25, PageID 315.) The public, however, does have an interest in the "protection of First Amendment liberties." *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995).

### Conclusion

The Secretary has failed to make a meritorious argument for a stay. A contrary finding, as the majority finds here, results from a weighing of the administrative costs to the state over the constitutional rights of individual Americans. This improper weighing of the motion to stay factors has the real world effect of allowing an unconstitutional law to remain in effect while depriving Michigan citizens of their right to vote. Accordingly, I respectfully dissent from the grant of the Secretary's motion.