# United States Court of Appeals

## For the First Circuit

No. 05-2310

AMERICAN HOME ASSURANCE COMPANY,

Plaintiff, Appellee,

v.

AGM MARINE CONTRACTORS, INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, Senior U.S. District Judge]

Before

Boudin, Chief Judge,

Torruella and Dyk,[*] Circuit Judges.

Eric F. Eisenberg with whom Jeremy Blackowicz and Hinckley, Allen & Snyder, LLP were on brief for appellant.
Robert J. Murphy with whom Holbrook & Murphy was on brief for appellee.

November 8, 2006

[*]Of the Federal Circuit, sitting by designation.

**BOUDIN, <u>Chief Judge</u>.** This insurance coverage case arises out of the following events. In fall 2000, the Town of Provincetown, Massachusetts ("Provincetown"), contracted with AGM Marine Contractors ("AGM") to reconstruct MacMillan Pier on the Provincetown waterfront and to procure and install a concrete floating dock system. Under AGM's superintendence, Southeast Floating Docks ("Southeast") agreed to provide floating docks for MacMillan Pier. Installation of the new dock system was completed in June 2003.

There were two main floating docks (A and B) extending outward from MacMillan Pier. These main docks floated on the surface of the water but stayed in position next to MacMillan Pier because piles, planted in the ground below the water's surface, ran though u-brackets on the sides of the floating docks. A number of smaller "finger" floating docks extended from the main floating docks and were held in place by connections to the main docks.

A strong winter storm occurred during December 5-7, 2003. Some of the floating docks broke loose; some sank; and most were irreparably damaged. Immediately after the storm, Provincetown directed AGM to retrieve the docks, which it did. AGM was later required by the town to provide replacement docks. AGM incurred significant costs which it sought to recover from both insurance and from Southeast (which it accused of having failed to follow specifications in building the docks).

-2-

In March 2004, AGM notified American Home Assurance Company ("American Home") of a claim under the commercial marine liability policy that American Home had issued to AGM, providing coverage from January 1, 2003 to January 1, 2004 ("the policy"). The policy is based on the standard Commercial General Liability Coverage ("CGL") form written by the Insurance Services Office ("ISO"), an organization of insurance companies that prepares standard form contracts, among other things.

American Home denied AGM's claim for coverage and on June 17, 2004, filed a petition for declaratory judgment in the federal district court in Massachusetts to establish that it had no liability under the policy. AGM counterclaimed and sought recovery for the cost of recovering the docks, loss of use of the docks and for repairing damage to the docks or replacing them. Both sides moved for summary judgment.

On July 25, 2005, the district court granted summary judgment in favor of American Home, concluding that the policy did not cover the losses for which AGM sought recovery. American Home Assurance Co. v. AGM Marine Contractors, Inc., 379 F. Supp. 2d 134, 135 (D. Mass. 2005). Less than six months later, an arbitrator granted AGM recovery against Southeast for $389,703, concluding that Southeast had failed to follow specifications in designing the docks. Southeast is currently contesting the arbitration award.

AGM now appeals from the district court's decision denying insurance coverage. Review on summary judgment is de novo, drawing inferences in favor of the non-moving party. Nicolo v. Phillip Morris, Inc., 201 F.3d 29, 33 (1st Cir. 2000). Where, as is the case here, cross-motions are involved, the court applies this standard to each motion separately. Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

Although the case is within the admiralty jurisdiction of the federal courts because the contract was "maritime in nature," Acadia Ins. Co. v. McNeil, 116 F.3d 599, 601, 603 (1st Cir. 1997), we look to state law (in this case Massachusetts), given the absence of a federal statute or a federal judicially created rule governing such contracts. Littlefield v. Acadia Ins. Co., 392 F.3d 1, 6-7 (1st Cir. 2004). Absent Massachusetts precedent, decisions elsewhere construing standard CGL language may be useful.

Generally, the policy provides that American Home "will pay those sums that [AGM] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Such damages must be caused by an "occurrence," defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." There are also numerous exclusions to coverage.

American Home's position is that there was neither an "occurrence" nor "property damage," and that even if there were,

two different exclusions apply: the "damage to Assured's work" exclusion and the "damage to Assured's product" exclusion. AGM takes the opposite position on each issue and, in addition, argues that there is coverage for damage to the docks under the "product-completed operations hazard" and that public policy requires coverage for the costs of recovering the docks after they broke loose.

That there should be doubts about the presence of an "occurrence" or "property damage" might initially puzzle an observer because the storm was obviously an "occurrence" in the common use of the term, and the breaking loose of the dock and its subsequent damage is easily described as an "accident" that led to "property damage." The doubts that some courts have expressed arise because CGL coverage is primarily directed to liabilities other than defects in one's own work. As the Massachusetts Supreme Judicial Court said, quoting an article on insurance:

> The risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself . . . .[1]

---

[1]Commerce Ins. Co. v. Betty Caplette Builders, Inc., 647 N.E.2d 1211, 1213 (Mass. 1995) (emphasis supplied) (quoting Roger C. Henderson, Insurance Protection for Products Liability and Completed Operations: What Every Lawyer Should Know, 50 Neb. L. Rev. 415, 441 (1971)); see also Farmington Cas. Co. v. Duggan, 417 F.3d 1141, 1142 (10th Cir. 2005); Modern Equip. Co. v. Continental Western Ins. Co., 355 F.3d 1125, 1129 (8th Cir. 2004); Russ, 9A Couch on Insurance § 129:1 (3d ed. 1995).

A curious split in authority has resulted. Some courts have held that faulty workmanship by the insured, so far as damage is only to its product, does not constitute an "occurrence" under CGL policies, e.g., Auto-Owners Ins. v. Home Pride Cos., 684 N.W.2d 571, 577 (Neb. 2004); see also Russ, 9A Couch on Insurance § 129:4 (3d ed. 1995); and others have held that faulty workmanship does not constitute "property damage," e.g., Amtrol, Inc. v. Tudor Ins. Co., 2002 WL 31194863, at *6 (D. Mass. 2002). By contrast, other courts have focused solely upon the exclusions of the CGL policy. E.g., Caplette, 647 N.E.2d at 1213.

The cases that have refused coverage at the occurrence or property damage threshold often involve the discovery of a latent defect or of an emerging negative condition (like construction defects, leaking water heaters, peeling paint, or cracking floors).[2] In such cases a court might well question whether there is literally an "occurrence" or "property damage" due to an "occurrence." But in this case what happened to the docks was far from a mere latent condition or slow deterioration, so many of the cases refusing coverage are distinguishable.

Whether Massachusetts would follow the "occurrence" cases is not certain. In Caplette the Supreme Judicial Court bypassed the issue in a case involving damage to the insured's product,

---

[2]Home Pride Cos., 684 N.W.2d at 574; Amtrol, 2002 WL 31194863, at *2; Indiana Ins. Co. v. Hydra Corp., 615 N.E.2d 70, 73 (Ill. App. Ct. 1993).

going instead directly to the exclusions.  This might suggest that the SJC thought that the occurrence and property damage requirements were satisfied, but the parties did not dispute the issue.  In all events, one of the exclusions in this case bars coverage even if we assume arguendo that there was an occurrence and property damage within the meaning of the policy.

We deal first with the "Assured's work" exclusion.  The "Assured's work" exclusion excludes coverage under the policy for the following:

> "Property damage" to "the Assured's work" arising out of it or any part of it and included in the "products-completed operations hazard."  This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on the Assured's behalf by a subcontractor.

Under the definitions section of the policy, "Assured's work" includes "work or operations performed by the Assured or on [its] behalf."  So at first blush, the "Assured's work" appears to include work done by Southeast, assuming that Southeast were a subcontractor.  But if Southeast were a subcontractor, the exclusion would not apply by virtue of its second sentence. And if instead Southeast were merely a vendor who supplied a product and not a subcontractor, the docks would not be the "Assured's work" or work done on "its behalf," so again the exclusion would not apply.

Of course, the exclusion would apply if the harm arose out of AGM's own work rather than that of Southeast.  However, the arbitrator found that the original cause of the breaking away of

-7-

the docks was faulty work by Southeast including failure to follow specifications. Conceivably American Home could contest this finding and blame AGM (the insurer was not a party to the arbitration). We need not pursue this possibility because the "Assured's product" exclusion does appear to bar coverage, even if the "Assured's work" exclusion does not.

The "Assured's product" exclusion precludes recovery for "'property damage' to 'the Assured's product' arising out of it or any part of it." The policy defines "Assured's product" to include "any goods or products, other than real property, manufactured, sold, handled, or distributed by . . . [t]he Assured." The "Assured's product" exclusion, like the "Assured's work" exclusion, is broadly consistent with the limited office of CGL coverage to protect against liability for harm "other than to the product or completed work itself." Caplette, 647 N.E.2d at 1213.

AGM disputes that the docks were its product, saying that they were made by Southeast. But if AGM acquired the docks from Southeast as a vendor and resold them to Provincetown, "sold" applies; if they were made by Southeast as a subcontractor and installed by AGM (and transferred to Provincetown as part of the overall project), they were at least "handled" by AGM.[3] So AGM's

_____

[3]AGM's argument that case law supports its claim that it did not "handle" the docks is unavailing. Gulf Miss. Marine Corp. v. George Engine Co., 697 F.2d 668 (5th Cir. 1983), is distinguishable. In Gulf the insured party was a subcontractor who merely touched the components while assembling them; here AGM was

-8-

response does not avoid the embracing language of the definition that triggers the exclusion.

Whether the docks come within the real property exception found in the definition of "Assured's product" is a closer question. The exception for real property eliminates from the exclusion a building constructed on the land and, arguably, a pier built upon and planted in submerged land (MacMillan Pier itself likely fits this description). But the main floating docks were tethered by the u-brackets and pilings rather than affixed to the submerged land below and the finger docks were connected to the main docks even more loosely.

The technical definition of real property, in the dictionary and some of the case law, covers those things "attached to, or erected on [the land], <u>excluding</u> anything that may be severed without injury to the land."[4] Similarly, Massachusetts case law defines real property as property "so annexed that it cannot be removed without material injury to the real estate or to itself." <u>Medford Trust Co.</u> v. <u>Priggen Steel Garage Co.</u>, 174 N.E.2d

---

responsible for procuring the docks and providing them in their final form to Provincetown.

[4]Black's Law Dictionary (8th ed. 2004) (emphasis supplied); <u>see also</u> <u>Wanzek Constr.</u> v. <u>Employers Ins.</u>, 679 N.W.2d 322, 327 (Minn. 2004) (citing Black's Law Dictionary in a CGL case); <u>American Equity Ins. Co.</u> v. <u>Van Ginhoven</u>, 788 So. 2d 388 (Dist. Ct. App. Fla. 2001) (citing Black's Law Dictionary and stating that "[t]he term 'real property' is a clearly understandable and defined legal term").

126, 128 (Mass. 1930). There is also good deal of related law seeking to determine whether an item is a "fixture"--personal property that becomes part of the real property, Bernheim, 2 Tiffany Real Property § 606 (3d ed. 1939 & Supp. 2006).

Case law as to whether floating docks are "real property" is not uniform--which is unsurprising because the issue arises under various statutes and in different contexts (sales, taxes, condemnation). A leading federal tax decision says that floating docks are not real property, Morgan v. Comm'r of Internal Revenue, 52 T.C. 478, 483 (Tax Ct. 1969); see also Rev. Rul. 75-178, 1975-1 C.B. 9, 1975 WL 34655. No Massachusetts case involving a floating dock has been cited to us, and case law in other jurisdictions is divided.[5]

Putting the divided cases to one side, the docks in this case were shipped to Provincetown and--instead of being incorporated physically into the land or ocean bottom--were used as floating concrete platforms, much like a tied-up barge. Under the classic definition of real property, the floating docks do not qualify as real property. They could easily be, and were in fact, severed from MacMillan Pier: the marine surveyor's report shows

---

[5]Compare Newport Island Yacht Club v. Inver Grove Heights Marina, Inc., 1995 WL 70215, at *2 (Minn. App. Ct. Feb. 21, 1995) (floating docks are personal property) with Taylor v. Township of Lower, 13 N.J. Tax 371, 387 (N.J. Tax Ct. 1993) (floating docks are real property). Pointlessly, American Home cites cases in its favor interpreting policies that happen to lack the real property exception.

that, without injury to MacMillan Pier, the docks sank or broke free and others were hoisted onto the pier after the storm.

One might argue that the docks and piles taken together comprise AGM's "product" and therefore "real property" for purposes of the "Assured's product" exclusion--given that the piles are embedded in the ocean floor. But the "severability" aspect implicit in Black's definition of real property contemplates that some items which are conceptually or even physically "connected" to real property may be so readily removable that they never lose their nature as personal property.

For example, courts have held that mobile homes, even where anchored to the ground and attached to utility lines, remain personal property. E.g., United States v. Shelby County, Tenn., 385 F. Supp. 1187, 1189 (W.D. Tenn. 1974). Similarly, a Massachusetts court noted that machines may remain chattels where the attachment to the land "merely stead[ies]" property for "more convenient use." Carpenter v. Walker, 5 N.E. 160, 162 (Mass. 1886). We conclude that the floating docks do not comprise real property under Massachusetts law.

Ambiguities in the policy are construed against the insurer, B & T Masonry Constr. Co. v. Pub. Serv. Mutual Ins. Co., 382 F.3d 36, 39 (1st Cir. 2004), but the general definition of real property excludes floating docks that can be removed without damage and we are offered no coherent counter-definition to set against

-11-

the classic definition, which has at least the advantage of mechanical application. That the floating docks may be _close_ to the line--being big structures that ordinarily are not moved about--does not make the line itself uncertain.

It would be a different matter if there were some obvious rationale for the real property exception in the policy that would be frustrated by applying the classic definition. But, so far as we can tell, the exception came about almost by happenstance;[6] and, so far as we understand the rationale for the "Assured's product" exclusion itself, as described in Caplette, it appears to apply with full force to the floating docks.

AGM has yet one more argument. It says that the "products-completed operations hazard" ("PCOH") provides it with coverage. PCOH is defined, with exceptions not here relevant, to include "all . . . 'property damage' occurring away from premises the Assured owns or rents" where work has been completed. Within the policy, several of the exclusions are made inapplicable to

---

[6]Earlier CGL policies did not have the real property exception; and, in construing such policies, courts divided as to whether the phrase "manufactured, sold, handled, or distributed" implicitly excluded real property, compare, e.g., Mid-United Contractors, Ins. v. Providence Lloyds Ins. Co., 754 S.W.2d 824, 826 (a building is not a product "because in ordinary language buildings are constructed or erected, not manufactured"), with Caplette, 647 N.E.2d at 1214 (a building is a product of its builder). The ISO inserted the real property language to resolve the matter. Cunningham & Fischer, Insurance Coverage in Construction--The Unanswered Question, 33 Tort & Ins. L.J. 1063, 1095-1096 (1998).

-12-

coverage found in PCOH.  For example, the "damage to property" exclusion has an exception for "'property damage' included in the 'products-completed operations hazard.'"

Seemingly, the damage to the docks would come within the clause defining PCOH.  But, contrary to AGM's premise, the policy does not on its own provide coverage for damage within the PCOH clause.  The clause merely renders a given exclusion inapplicable where that exclusion so provides.  The "Assured's product" exclusion contains no reference to the clause and therefore remains applicable to PCOH damage.

Although we conclude that the "Assured's product" exclusion does apply to the damage suffered by the docks themselves, this does not quite end the story.  It means that the cost of replacing the floating docks (apparently about $230,000) is not covered by the policy; but AGM's claims were not only for the cost of replacing the docks but also for emergency work in recovering the sunken or loose docks and for the cost of providing temporary docks in the interim.

Non-coverage of the temporary docks and the emergency work follows from non-coverage of the docks themselves.  The basic coverage under the CGL policy is for liability incurred "because of" "property damage" ("bodily injury" is not present in this case).  Thus, the cost of temporary replacement for covered property might well be recoverable.  But it is hard to see how

-13-

coverage would exist for temporary replacement of <u>excluded</u> property. AGM points to no policy language or rationale for such coverage.

Non-coverage is also clear as to the emergency work. That work on its face is even harder to classify as liability for property damage--save that courts have been willing in some circumstances to include the cost of emergency efforts on the premise that the insured is mitigating insured losses that would otherwise be borne by the insurance company and that it serves public policy to encourage such mitigation.[7]

This rationale fails if the property losses to the relevant product are themselves <u>not</u> covered and the insured has no obligation to replace the property. To be sure, public policy might want to encourage mitigation, but not necessarily at the insurer's expense, and anyway AGM had a substantial self-interest in mitigating losses itself. It might be a different case if the docks had actually threatened bodily injury or third-party property damage for which American Home could be responsible.

The rationale for the patchwork coverage provided by the CGL policy is obscure and especially hard to understand without more information about other coverages available for product

---

[7]<u>Intel Corp.</u> v. <u>Hartford Accident & Indem. Co.</u>, 692 F. Supp. 1171, 1193 (N.D. Cal. 1988), <u>aff'd in part</u>, 952 F.2d 1551 (9th Cir. 1991); <u>Bankers Trust Co.</u> v. <u>Hartford Accident & Indem. Co.</u>, 518 F. Supp. 371, 373-74, <u>vacated</u>, 621 F. Supp. 685 (S.D.N.Y. 1981).

defects.  All we can do is take the relevant provisions one by one and match them against the facts of this case.  Having done so we conclude that coverage was properly denied.

Affirmed.