# United States Court of Appeals
## For the First Circuit

No. 09-1607

MARITIMES & NORTHEAST PIPELINE, LLC,

Plaintiff, Appellee,

v.

ECHO EASEMENT CORRIDOR, LLC,

Defendant, Appellant,

KENNEBEC WEST FOREST LLC; PENOBSCOT FOREST LLC,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin and Stahl, Circuit Judges.

William B. Devoe with whom Ryan P. Dumais and Eaton Peabody were on brief for appellant.
James T. Kilbreth with whom Alexia Pappas and Verrill Dana LLP, were on brief for appellee Maritimes & Northeast Pipeline LLC.
Deborah M. Mann with whom Jensen Baird Gardner & Henry were on brief for appellees Kennebec West Forrest LLC and Penobscot Forest LLC.

May 7, 2010

**STAHL**, <u>Circuit Judge</u>.  This case concerns a dispute over the use of a private road.  Defendant-Appellant ECHO Easement Corridor, LLC ("ECHO") is the holder of an easement over an approximately 2,000-foot wide strip of timberland in east-central Maine called the "Easement Corridor."  A privately-owned gravel road known as Stud Mill Road is generally the centerline of the Corridor and serves as its central travel artery.  Though the easement it holds grants ECHO certain rights over the Corridor, the fee interest in the underlying land is held by Kennebec West Forest LLC ("Kennebec West").

In October 2007, Plaintiff-Appellee Maritimes & Northeast Pipeline, LLC ("Maritimes") acquired from Kennebec West a parcel of land to the north of the Easement Corridor in an area known as Woodchopping Ridge (the "Woodchopping Ridge Property"[1]).  On January 30, 2008, as part of a natural gas pipeline expansion project, Maritimes filed a Complaint against ECHO and other defendants[2] for, among other claims, a declaratory judgment that Maritimes possessed sufficient rights over Stud Mill Road to allow

---

[1]We will refer to the property which Kennebec West conveyed to Maritimes as the Woodchopping Ridge Property for the purpose of clarity in this opinion, noting that such term may have been defined differently by Maritimes in its Complaint.

[2]Kennebec West and its subsidiary Penobscot Forest LLC ("PF") were also named as defendants in this action.  Below, they did not object to Maritimes' motion for summary judgment on the declaratory judgment claim, and here they have adopted Maritimes' arguments.

it to use Stud Mill Road and a connecting spur road[3] for the purpose of constructing, operating, and maintaining a natural gas compressor station on the Woodchopping Ridge Property.[4]   In granting Maritimes' motion for summary judgment as to its declaratory judgment claim, the district court concluded that Maritimes possesses sufficient easement rights by virtue of its acquisition from Kennebec West to allow it to use Stud Mill Road to access the Woodchopping Ridge Property for the stated purpose.  We affirm.

## I. Facts and Background

Stud Mill Road traverses the historic timberland holdings of International Paper Company ("International Paper") in central Maine.  Prior to May 2004, when the first easement to ECHO was granted, the road had been consistently used for, among other purposes, construction, maintenance, and monitoring of utility easements and had provided access to adjacent forest lands.  In addition, members of the public used the road to access remote camps for recreational purposes.

---

[3]Maritimes' use of the connecting spur is not at issue here.

[4]Maritimes' existing pipeline assets run within the Easement Corridor, approximately twenty-five feet from the southern boundary of Stud Mill Road.  The compressor station and the existing pipeline are to be connected by suction and discharge lines that cut perpendicularly across the Easement Corridor.  The site of the suction and discharge lines was the subject of a different count of Maritimes' Complaint and is not at issue in this appeal.

On December 20, 2004, International Paper and SP Forests, LLC ("SP"), a wholly-owned subsidiary of International Paper, executed the "Road and Utility Corridor Easement" ("Easement") granting ECHO, a wholly-owned subsidiary of SP, a perpetual easement in gross over the Easement Corridor.[5] The Easement generally conferred to ECHO the right to control road use and construction and to grant and locate utility easements within the defined Corridor.[6]

Ten days later, on December 30, 2004, International Paper and SP conveyed certain of their timberland holdings to Kennebec West. This grant gave Kennebec West a fee interest in the land underlying and adjacent to the Easement Corridor, including the land underlying that portion of Stud Mill Road within the Easement Corridor, subject to ECHO's rights as defined by the Easement.

A few months after the sale, International Paper, SP, Kennebec West, and Kennebec West subsidiary Penobscot Forest, LLC ("PF") entered into an amended easement with ECHO. Executed on May 12, 2005, the "Amended and Restated Road and Utility Corridor Easement" ("Amended Easement") superseded the prior easement. Like

---

[5]The "Road and Utility Corridor Easement" amended, restated, and superseded the "Stud Mill Utility Corridor Easement" between the same parties, dated May 25, 2004.

[6]David C. Hooper, ECHO's Vice President as well as an employee of International Paper, indicated in his affidavit that the Easement Corridor may be the site for a portion of a future east-west toll road in Maine, and he estimated that the economic impact for ECHO from this toll road could be over $353 million.

-4-

its predecessor, the Amended Easement grants ECHO specific rights over road and utility use and construction within the Easement Corridor.  For example:

> Within the Easement Corridor, ECHO shall have the right, in its sole discretion, to locate, construct, pave, repair, maintain, replace, expand, improve and make interconnections among roads, roadway infrastructure, and related facilities, to assign, grant, or permit the use of the same upon such terms as it may decide, and to impose or collect such tolls, fees, or other charges for such use as it may choose.

Further:

> Within the Easement Corridor, ECHO shall have the right, in its sole discretion, to locate, construct, install, repair, maintain, replace, expand, and remove utilities, utility infrastructure, and related facilities.

The Amended Easement subsequently provides:

> This is an easement in gross, but it is expressly agreed and expected by [Kennebec West], PF, SP and ECHO that ECHO shall have the right to, and will from time to time, assign and grant such rights and/or subsets thereof to others in ECHO's sole discretion, provided that any such assignment or grant of the right to operate a road shall be made only to a federal, state, or municipal transportation authority or similar governmental or quasi-governmental entity.  It is a primary purpose of this easement that ECHO shall receive and consider all requests from those who wish to use roads or locate utility easements within the Easement Corridor, grant such easements as it deems advisable (subject to the terms and conditions of this easement), and manage and regulate the use and operation of all easements within the Easement Corridor.  The easements granted by ECHO shall be considered partial assignments of the rights granted to ECHO by this easement and shall not diminish the right and authority of ECHO to continue to grant further and additional easements to others.  The rights conferred by this easement are exclusive, so that neither

-5-

SP[7] [defined to include International Paper] nor their successors nor assigns shall have the right to use the Easement Corridor for the stated purposes and uses (except as permitted by ECHO in compliance with this easement) nor to grant any similar rights therein to others. <u>Notwithstanding the foregoing, [Kennebec West], PF, SP, their successors, and assigns shall continue to have and reserve the use of Stud Mill Road within the Easement Corridor, subject to the right of ECHO to relocate the same or provide substitute equivalent alternative access.</u>

(emphasis added).

In October 2007, Kennebec West transferred a fee interest in the Woodchopping Ridge Property to Maritimes. The quitclaim deed by which Kennebec West transferred the property ("Kennebec West-Maritimes Deed") explicitly conveys "non-exclusive easement rights appurtenant to the Property" in the "'use of the Stud Mill Road within the Easement Corridor' . . . and . . . use of the connecting spur Road . . . both as reserved in an Amended and Restated Road and Utility Corridor Easement dated May 12, 2005 . . . ."

The parties agree that by virtue of the Kennebec West-Maritimes deed, Maritimes is a successor and assign of Kennebec West within the meaning of the Amended Easement, and thus possesses whatever rights to use Stud Mill Road that Kennebec West held under

_____

[7]ECHO states that it was a scrivener's error to reference only SP in this sentence. According to ECHO, the reference should have included Kennebec West, PF, SP, and ECHO. But, as the district court noted, even if ECHO is correct, that does not alter the subsequent sentence ("Notwithstanding the foregoing . . .") that reserves to Kennebec West and its successors and assigns the rights to use Stud Mill Road that are at issue.

-6-

the Amended Easement.  ECHO contends, however, that those rights are not sufficiently broad to allow Maritimes to use the road by traversing it with vehicles for the purpose of constructing and maintaining the compressor station.

In granting summary judgment in favor of Maritimes, the district court found that the language of the Amended Easement was unambiguous in reserving for Kennebec West (and thus, Maritimes) the right to use Stud Mill Road.  ECHO appeals.

## II. Analysis

We review the district court's grant of summary judgment de novo.  Lockridge v. The University of Maine System, 597 F.3d 464, 469 (1st Cir. 2010).  Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The facts in this matter are undisputed.  Where the parties differ is in their interpretation of the language of the Amended Easement.

The construction of language in an easement deed is a question of law.  Crispin v. Town of Scarborough, 736 A.2d 241, 250 (Me. 1999) (citing Fine Line, Inc. v. Blake, 677 A.2d 1061, 1063 (Me. 1996)).  "A court construing the language in a deed must give the words their general and ordinary meaning and must first attempt to construe the language of the deed by looking only within the four corners of the instrument."  Pettee v. Young, 783 A.2d 637,

640 (Me. 2001) (internal quotations and citations omitted). "If the language of the deed is unambiguous, the scope of a party's easement rights is determined solely from that language." Crispin, 736 A.2d at 250 (citing Fine Line, Inc., 677 A.2d at 1063).

We look within the four corners of the operating document, the Amended Easement, to determine whether its language is ambiguous, and we find, as the district court did, that it is not.

Among its enumerated purposes, the Amended Easement explicitly confers to ECHO the right, in its sole discretion, "to assign, grant, or permit" the use of roads within the Easement Corridor, and "to impose or collect such tolls, fees, or other charges for such use as it may choose."

The Amended Easement later acknowledges that "[t]he rights conferred by this easement are exclusive, so that neither SP nor their successors nor assigns shall have the right to use the Easement Corridor for the stated purposes and uses (except as permitted by ECHO in compliance with this easement) nor to grant any similar rights therein to others."

However, the following sentence states that "[n]otwithstanding the foregoing, [Kennebec West], PF, SP, their successors, and assigns shall continue to have and reserve the use of Stud Mill Road within the Easement Corridor, subject to the right of ECHO to relocate the same or provide substitute equivalent

alternative access." (emphasis added). This sentence unambiguously reserves to Kennebec West, and therefore Maritimes, the right to use Stud Mill Road.

ECHO argues that when employing the word "use" in that sentence, the parties to the Amended Easement reserved from the grant to ECHO only "their traditional access and use rights" within the Easement Corridor, which do not extend to road access for the construction and operation of a new utility project. We disagree. There is no language in the Amended Easement which limits the word "use."

ECHO maintains that despite the lack of such limiting language, a reading of the Amended Easement in its entirety reveals the parties' intent to create such a limitation.[8] But upon close review of the document as a whole, we cannot but agree with the district court's conclusion. Though the Amended Easement grants ECHO broad rights over the use and placement of roads and utilities within the Easement Corridor, the fee holders carved out for themselves (and their assigns) the use of Stud Mill Road -- the primary means of access to the adjacent property. ECHO has the right to relocate Stud Mill Road or to provide "substitute

---

[8]Although ECHO also maintains that the two prior versions of the Amended Easement have some bearing, we consider only the Amended Easement, as it is controlling. It explicitly states that it "amends, restates, and supersedes" both prior versions. In any event, a review of the two previous easements would not change our analysis.

equivalent alternative access."  Barring those remedies, the Amended Easement does not restrict Maritimes in its use of Stud Mill Road for the construction, operation, and maintenance of a compressor station on the Woodchopping Ridge Property.[9]

### III. Conclusion

Thus, we affirm the district court's entry of summary judgment in favor of Maritimes.

**Affirmed.**

---

[9]We note that the compressor station at issue is located <u>outside</u> the Easement Corridor.  Thus, a declaration of Maritimes' non-exclusive right to use Stud Mill Road to access the Woodchopping Ridge Property for that purpose does not impact ECHO's rights to control the use and location of utilities within the Easement Corridor.