# United States Court of Appeals
## For the First Circuit

No. 15-2021

LEON H. RIDEOUT, ANDREW LANGLOIS, BRANDON D. ROSS,

Plaintiffs, Appellees,

v.

WILLIAM M. GARDNER,
in his official capacity as Secretary of State of the State of
New Hampshire,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Lynch, Lipez, and Thompson,
Circuit Judges.

Stephen G. LaBonte, Assistant Attorney General, with whom
Joseph A. Foster, New Hampshire Attorney General, and Laura E. B.
Lombardi, Senior Assistant Attorney General, were on brief, for
appellant.
Gilles R. Bissonnette, with whom American Civil Liberties
Union of New Hampshire, William E. Christie, and Shaheen & Gordon,
P.A. were on brief, for appellees.
Christopher T. Bavitz, Cyberlaw Clinic, Harvard Law School,
Justin Silverman, and Andrew F. Sellars on brief for The New
England First Amendment Coalition and The Keene Sentinel, amici
curiae.
Eugene Volokh and Scott & Cyan Banister First Amendment
Clinic, UCLA School of Law on brief for the Reporters Committee

for Freedom of the Press, amicus curiae.

Neal Kumar Katyal, Sean Marotta, Hogan Lovells US LLP, Christopher T. Handman, and Dominic F. Perella on brief for Snapchat, Inc., amicus curiae.

_____

September 28, 2016

_____

**LYNCH**, **Circuit Judge**.  In 2014, New Hampshire amended a statute meant to avoid vote buying and voter intimidation by newly forbidding citizens from photographing their marked ballots and publicizing such photographs.  While the photographs need not show the voter, they often do and are commonly referred to as "ballot selfies."  The statute imposes a fine of up to $1,000 for a violation of the prohibition.  See N.H. Rev. Stat. Ann. § 659:35, IV; id. § 651:2, IV(a).

Three New Hampshire citizens who are under investigation for violation of the revised statute, and who are represented by the American Civil Liberties Union of New Hampshire, challenged the statute's constitutionality.  The district court held that the statute is a content-based restriction of speech that on its face violates the First Amendment.  Rideout v. Gardner, 123 F. Supp. 3d 218, 221 (D.N.H. 2015).  The New Hampshire Secretary of State appeals, arguing that the statute is justified as a prophylactic measure to prevent new technology from facilitating future vote buying and voter coercion.  We affirm on the narrower ground that the statute as amended fails to meet the test for intermediate scrutiny under the First Amendment and that the statute's purposes cannot justify the restrictions it imposes on speech.

I.

In the late nineteenth century, political parties, unions, and other organizations had the power to print their own

ballots, each of which was easily identifiable and distinguishable from other ballots by size and color. This practice allowed the ballot-printing organizations to observe how individuals voted at the polls, which in turn created an obviously coercive environment. During this period, New Hampshire undertook a series of reforms to combat widespread vote buying and voter intimidation. In 1891, the State passed legislation requiring the Secretary of State to prepare ballots for state and federal elections. 1891 N.H. Laws ch. 49, § 10. The State then passed a statute to forbid any voter from "allow[ing] his ballot to be seen by any person, with the intention of letting it be known how he is about to vote." 1911 N.H. Laws ch. 102, § 2.

Since at least 1979, that provision has been codified in relevant part at section 659:35, I, which, until 2014, read: "No voter shall allow his ballot to be seen by any person with the intention of letting it be known how he is about to vote except as provided in RSA 659:20." The exception in section 659:20 allows voters who need assistance marking a ballot to receive such assistance. N.H. Rev. Stat. Ann. § 659:20. In 2014, the New Hampshire legislature revised section 659:35, I as follows:

> No voter shall allow his or her ballot to be seen by any person with the intention of letting it be known how he or she is about to vote or how he or she has voted except as provided in RSA 659:20. This prohibition shall include taking a digital image or photograph of his or her marked ballot and distributing or sharing the image via social media or by any other means.

Id. § 659:35, I (revisions underlined).  The penalty for a violation of the statute is a fine of up to $1,000.  Id. § 659:35, IV; id. § 651:2, IV(a).

The original version of HB366, the bill amending section 659:35, I, provided that "[n]o voter shall take a photograph or a digital image of his or her marked ballot," and was introduced by State Representative Timothy Horrigan on January 3, 2013. Horrigan stated that "[t]he main reason this bill is necessary is to prevent situations where a voter could be coerced into posting proof that he or she voted a particular way."  The bill started at the House Committee on Election Law, which recommended its passage, and the members of which expressed rationales for the bill similar to Horrigan's.

The bill then went to the House Committee on Criminal Justice and Public Safety.  Deputy Secretary of State David Scanlan spoke in support of the bill, emphasizing the need to prevent vote buying and to protect the "privacy of [the] ballot." Though a majority of the members of the Criminal Justice Committee supported the bill, a minority disagreed and filed a report concluding that the bill was "an intrusion on free speech."  In order to restrict the bill's scope to activity connected to vote buying, the minority suggested amending the bill as follows:

This prohibition shall include taking a digital image or photograph of his or her marked ballot and distributing

- 5 -

or sharing the image via social media or by any other means <u>only if the distribution or sharing is for the purpose of receiving pecuniary benefit, as defined in RSA 640:2, II(c), or avoiding harm, as defined in RSA 640:3.</u>[1]

The majority of the Criminal Justice Committee did not support this amendment, however, and HB366, absent the proposed limitation, proceeded to the full House of Representatives, which passed it by a vote of 198-96. The bill was then introduced to the Senate Committee on Public and Municipal Affairs, which recommended the bill to the full Senate. The Senate passed the bill, and the Governor signed the bill into law, effective September 1, 2014.

The legislative history of the bill does not contain any corroborated evidence of vote buying or voter coercion in New Hampshire during the twentieth and twenty-first centuries. Representative Mary Till, who authored the House Committee on

---

[1] New Hampshire law defines "pecuniary benefit" as "any advantage in the form of money, property, commercial interest or anything else, the primary significance of which is economic gain; it does not include economic advantage applicable to the public generally, such as tax reduction or increased prosperity generally." N.H. Rev. Stat. Ann. § 640:2, II(c).

New Hampshire law defines "harm" as "any disadvantage or injury, to person or property or pecuniary interest, including disadvantage or injury to any other person or entity in whose welfare the public servant, party official, or voter is interested, provided that harm shall not be construed to include the exercise of any conduct protected under the First Amendment to the United States Constitution or any provision of the federal or state constitutions." N.H. Rev. Stat. Ann. § 640:3, II.

Election Law's statement of intent for the bill, provided the sole anecdotal allegation of vote buying. She asserted:

> I was told by a Goffstown resident that he knew for a fact that one of the major parties paid students from St[.] Anselm's $50 to vote in the 2012 election. I don't know whether that is true or not, but I do know that if I were going to pay someone to vote a particular way, I would want proof that they actually voted that way.

No evidence supported this hearsay allegation. The district court correctly held that "[t]he summary judgment record does not include any evidence that either vote buying or voter coercion has occurred in New Hampshire since the late 1800s." Rideout, 123 F. Supp. 3d at 224.

As of August 11, 2015, when the district court issued the summary judgment order on appeal here, the New Hampshire Attorney General's Office had undertaken investigations of four individuals for alleged violations of section 659:35, I, arising from their publication of "ballot selfies"[2] after voting in the September 9, 2014 Republican primary election. Three of those

---

[2] Amicus curiae Snapchat highlights the extent of the use of "ballot selfies," defined not strictly as "a photo where the photographer is also a subject," but rather as "all smartphone pictures shared online, including those here . . . [and] any picture that could violate the New Hampshire statute." As amici curiae New England First Amendment Coalition and the Keene Sentinel observe, "the term 'ballot selfie' has worked its way into the popular lexicon to describe just such a photograph." See, e.g., David Mikkelson, Ballot Selfies, Snopes (Feb. 8, 2016), http://www.snopes.com/dont-selfie-your-ballot.

individuals -- Leon Rideout, Andrew Langlois, and Brandon Ross -- are the plaintiffs in this case.[3]

Rideout, a member of the New Hampshire House of Representatives and a Selectman for Lancaster, New Hampshire, took a photograph of his ballot, which showed that he had voted for himself and other Republican candidates in the September 9, 2014 primary. Later that day, he posted the ballot selfie on his Twitter feed and on his House of Representatives Facebook page. He then explained in an interview with the Nashua Telegraph, published on September 11, 2014, that he took and posted the photograph online "to make a statement," and that he thought section 659:35, I was "unconstitutional."

Langlois, who voted in Berlin, New Hampshire, did not approve of the Republican candidates for the United States Senate, and so wrote in the name of his recently deceased dog, "Akira," and took a photograph of his ballot. When he returned home, he posted the ballot selfie on Facebook with a note that read in part: "Because all of the candidates SUCK, I did a write-in of Akira . . . ." He was then called by an investigator from the New Hampshire Attorney General's Office and informed he was under investigation.

---

[3] All three plaintiffs have entered into agreements with the State to toll the three-month statute of limitations period for section 659:35, I, pending resolution of this litigation.

Ross, who was a candidate for the New Hampshire House of Representatives in the 2014 primary, voted in Manchester, New Hampshire. He took a photograph of his marked ballot, which reflected that he voted for himself and other Republican candidates. He was aware of HB366's amendment to section 659:35, I and, because of the law's penalties, did not immediately publicize the ballot selfie. More than a week later, on September 19, 2014, having learned that other voters were under investigation for violating section 659:35, I, Ross posted the ballot selfie on Facebook with a note reading: "Come at me, bro." Representative Horrigan, the legislator who had introduced the amendment to section 659:35, I, filed an election law complaint against Ross, which led to an investigation of Ross by the state Attorney General's Office.

On October 31, 2014, the plaintiffs filed suit under 42 U.S.C. § 1983 in the U.S. District Court for the District of New Hampshire. The complaint sought a declaration invalidating section 659:35, I as unconstitutional on its face and as applied, and an injunction forbidding New Hampshire from enforcing the statute. The parties filed cross-motions for summary judgment and agreed that no material facts are in dispute.

In a thoughtful opinion, the district court determined that section 659:35, I is a content-based restriction on speech. Rideout, 123 F. Supp. 3d at 229. The court observed that the

- 9 -

Supreme Court has identified statutes as content-based restrictions "if [the] law applies to particular speech because of the topic discussed or the idea or message expressed." Id. (quoting Reed v. Town of Gilbert, 135 S. Ct. 2218, 2227 (2015)). The district court reasoned that "the law [under review] is plainly a content-based restriction on speech because it requires regulators to examine the content of the speech to determine whether it includes impermissible subject matter." Id.

The district court applied strict scrutiny, "which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." Id. at 228 (quoting Reed, 135 S. Ct. at 2231). Secretary Gardner, the named defendant, asserted the prevention of vote buying and voter coercion as the State's compelling interests justifying the restriction. Id. at 231. The district court found that although those two asserted interests were "plainly compelling in the abstract," id., "neither the legislative history nor the evidentiary record compiled by the Secretary in defense of this action provide any support for the view that the state has an actual or imminent problem with images of completed ballots being used to facilitate either vote buying or voter coercion," id. at 232. And the court found that the statute was not narrowly tailored because it was "vastly overinclusive" and would, "for the most part, punish only the innocent while leaving actual

- 10 -

participants in vote buying and voter coercion schemes unscathed." Id. at 234. Moreover, the court observed that the Secretary had failed to demonstrate why narrower alternatives, such as a statute "mak[ing] it unlawful to use an image of a completed ballot in connection with vote buying and voter coercion," would not advance the purported state interests. Id. at 235. The district court held the statute to be unconstitutional on its face and granted declaratory relief to the plaintiffs, trusting that such relief absent an injunction would secure compliance by the Secretary. Id. at 236.

## II.

We give de novo review to an appeal both from a ruling on cross-motions for summary judgment and from pure issues of law. Maritimes & Ne. Pipeline, LLC v. Echo Easement Corridor, LLC, 604 F.3d 44, 47 (1st Cir. 2010); Am. Home Assurance Co. v. AGM Marine Contractors, Inc., 467 F.3d 810, 812 (1st Cir. 2006). Here, no material facts are in dispute; the issues are ones of law. See Buchanan v. Maine, 469 F.3d 158, 162 (1st Cir. 2006) (de novo review of issues of law on appeal from summary judgment).

The First Amendment, which applies to the States through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Standards to evaluate justifications by the state of a restriction on speech turn, inter alia, on whether the restriction

focuses on content, that is, if it applies to "particular speech because of the topic discussed or the idea or message expressed." Reed, 135 S. Ct. at 2227. "This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." Id. Content-based regulations are subject to strict scrutiny, which requires the government to demonstrate "a compelling interest and . . . narrow[] tailor[ing] to achieve that interest." Id. at 2231 (quoting Ariz. Free Enter. Club's Freedom Club PAC v. Bennett, 564 U.S. 721, 734 (2011)). Narrow tailoring in the strict scrutiny context requires the statute to be "the least restrictive means among available, effective alternatives." Ashcroft v. Am. Civil Liberties Union, 542 U.S. 656, 666 (2004).

In contrast, content-neutral regulations require a lesser level of justification. These laws do not apply to speech based on or because of the content of what has been said, but instead "serve[] purposes unrelated to the content of expression." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989). "The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the context of expression is deemed neutral . . . ." Id. (citation omitted). Content-neutral

- 12 -

restrictions are subject to intermediate scrutiny, which demands that the law be "narrowly tailored to serve a significant governmental interest." Id. "[U]nlike a content-based restriction of speech, [a content-neutral regulation] 'need not be the least restrictive or least intrusive means of' serving the government's interests." McCullen v. Coakley, 134 S. Ct. 2518, 2535 (2014) (quoting Ward, 491 U.S. at 798).

We reach the conclusion that the statute at issue here is facially unconstitutional even applying only intermediate scrutiny. [4] See, e.g., McCutcheon v. Fed. Election Comm'n, 134 S. Ct. 1434, 1446 (2014)("Because we find a substantial mismatch between the Government's stated objective and the means selected to achieve it, the aggregate limits fail even under the 'closely drawn' test. We therefore need not parse the differences between the two standards in this case."). Like in McCutcheon, there is a substantial mismatch between New Hampshire's objectives and the ballot-selfie prohibition in section 659:35, I.[5]

---

[4] The district court chose to rely on reasoning that section 659:35, I is a content-based restriction. Rideout, 123 F. Supp. 3d at 229. To reach this conclusion, it relied heavily on the Supreme Court's recent decision in Reed. Id. at 228–29. Secretary Gardner vigorously contests this conclusion. As the statute fails even intermediate scrutiny, we need not resolve the question of whether section 659:35, I is a content-based regulation.

[5] Because the statute fails under intermediate scrutiny, we also need not reach the plaintiffs' argument that the statute fails under the overbreadth doctrine. See, e.g., United States

- 13 -

In order to survive intermediate scrutiny, section 659:35, I must be "narrowly tailored to serve a significant governmental interest." McCullen, 134 S. Ct. at 2534 (quoting Ward, 491 U.S. at 796). Though content-neutral laws "'need not be the least restrictive or least intrusive means of' serving the government's interests," id. at 2535 (quoting Ward, 491 U.S. at 798), "the government still 'may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals,'" id. (quoting Ward, 491 U.S. at 799). The statute fails this standard.

Secretary Gardner essentially concedes that section 659:35, I does not respond to a present "'actual problem' in need of solving." Brown v. Entm't Merchs. Ass'n, 564 U.S. 786, 799 (2011) (quoting United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 822 (2000)). Instead, he argues that the statute serves prophylactically to "preserve the secrecy of the ballot" from potential future vote buying and voter coercion, because ballot selfies make it easier for voters to prove how they voted. He characterizes the amendment in section 659:35, I as a natural update of the older version of the statute, done in response to the development of "modern technology, such as digital photography

v. Stevens, 559 U.S. 460, 473 (2010).

- 14 -

and social media," which may facilitate a future rise in vote buying and voter intimidation schemes.

As the district court noted, the prevention of vote buying and voter coercion is unquestionably "compelling in the abstract." Rideout, 123 F. Supp. 3d at 231. But intermediate scrutiny is not satisfied by the assertion of abstract interests. Broad prophylactic prohibitions that fail to "respond[] precisely to the substantive problem which legitimately concerns" the State cannot withstand intermediate scrutiny. Members of City Council of City of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 810 (1984).

Digital photography, the internet, and social media are not unknown quantities -- they have been ubiquitous for several election cycles, without being shown to have the effect of furthering vote buying or voter intimidation. As the plaintiffs note, "small cameras" and digital photography "have been in use for at least 15 years," and New Hampshire cannot identify a single complaint of vote buying or intimidation related to a voter's publishing a photograph of a marked ballot during that period. Indeed, Secretary Gardner has admitted that New Hampshire has not received any complaints of vote buying or voter intimidation since at least 1976, nor has he pointed to any such incidents since the nineteenth century. "[T]he government's burden is not met when a 'State offer[s] no evidence or anecdotes in support of its restriction.'" El Día, Inc. v. P.R. Dep't of Consumer Affairs,

413 F.3d 110, 116 (1st Cir. 2005) (alteration in original) (quoting Fla. Bar v. Went For It, Inc., 515 U.S. 618, 628 (1995)).[6]

Secretary Gardner also highlights scattered examples of cases involving vote buying from other American jurisdictions. See United States v. Thomas, 510 F.3d 714, 717 (7th Cir. 2007); United States v. Shatley, 448 F.3d 264, 265-66 (4th Cir. 2006); United States v. Johnson, No. 5:11-CR-143, 2012 WL 3610254, at *1 (E.D. Ky. Aug. 21, 2012). But Secretary Gardner admits that "there is no evidence that digital photography [of a ballot shared with others by a voter] played a[ny] role in any of the examples" he cites. A few recent instances of vote buying in other states do not substantiate New Hampshire's asserted interest in targeting vote buying through banning the publication of ballot selfies.

Secretary Gardner tries to anchor the state interest for section 659:35, I on Burson v. Freeman, 504 U.S. 191 (1992) (plurality opinion), which held that Tennessee had a compelling interest in banning "the solicitation of votes and the display or

---

[6] Secretary Gardner does point to history abroad. He references the plebiscite held upon the German annexation of Austria in 1938, in which "Adolf Hitler instituted election rules that allowed voters to voluntarily show their ballot as they were voting." He also notes that Saddam Hussein employed ballots "contain[ing] a code number which he believed could be traced back to the voter." There is no evidence that these historical examples from dictatorships have any material relationship to the present political situation in the State of New Hampshire, a democracy. Indeed, the restrictions on speech imposed by this amendment are antithetical to democratic values and particularly impose on political speech.

- 16 -

distribution of campaign materials within 100 feet of the entrance to a polling place."  Id. at 193.  Burson is obviously distinguishable.  The discussion in Burson of the long history of regulating polling places and the location of elections makes clear that the interest at stake in Burson centered on the protection of physical election spaces from interference and coercion.  See id. at 200-10.  The plurality acknowledged in Burson that two competing interests had to be balanced: the right to speak on political issues and the right to be free from coercion or fraud at the polling place.  Id. at 211.

The intrusion on the voters' First Amendment rights is much greater here than that involved in Burson.  Section 659:35, I does not secure the immediate physical site of elections, but instead controls the use of imagery of marked ballots, regardless of where, when, and how that imagery is publicized.

But even accepting the possibility that ballot selfies will make vote buying and voter coercion easier by providing proof of how the voter actually voted, the statute still fails for lack of narrow tailoring.  "[B]y demanding a close fit between ends and means, the tailoring requirement [under intermediate scrutiny] prevents the government from too readily 'sacrific[ing] speech for efficiency.'"  McCullen, 134 S. Ct. at 2534 (third alteration in

- 17 -

original) (quoting <u>Riley</u> v. <u>Nat'l Fed'n of Blind of N.C., Inc.</u>, 487 U.S. 781, 795 (1988)).[7]

New Hampshire has "too readily forgone options that could serve its interests just as well, without substantially burdening" legitimate political speech. <u>Id.</u> at 2537. At least two different reasons show that New Hampshire has not attempted to tailor its solution to the potential problem it perceives. First, the prohibition on ballot selfies reaches and curtails the speech rights of all voters, not just those motivated to cast a particular vote for illegal reasons. New Hampshire does so in the name of trying to prevent a much smaller hypothetical pool of voters who, New Hampshire fears, may try to sell their votes. New Hampshire admits that no such vote-selling market has in fact emerged. And to the extent that the State hypothesizes this will make intimidation of some voters more likely, that is no reason to infringe on the rights of all voters.

Second, the State has not demonstrated that other state and federal laws prohibiting vote corruption are not already adequate to the justifications it has identified. <u>See</u> 18 U.S.C. § 597 (prohibiting buying or selling votes); 52 U.S.C. § 10307(b)

---

[7] Amicus curiae Snapchat notes, by analogy, that other circuits have similarly held bans on petit juror interviews to fail at narrow tailoring. <u>See</u> <u>In re Express-News Corp.</u>, 695 F.2d 807, 808 (5th Cir. 1982); <u>United States</u> v. <u>Sherman</u>, 581 F.2d 1358, 1360–61 (9th Cir. 1978). We need not examine the analogy.

(prohibiting voter coercion or intimidation); id. § 10307(c) (prohibiting "pay[ing] or offer[ing] to pay or accept[ing] payment either for registration to vote or for voting" in some federal elections); N.H. Rev. Stat. Ann. § 659:40, I (prohibiting vote-related bribery); id. § 659:40, II (prohibiting voter coercion or intimidation); id. § 659:37 (prohibiting interfering with voters). New Hampshire suggests that it has no criminal statute preventing a voter from selling votes. That can be easily remedied without the far reach of this statute. The State may outlaw coercion or the buying or selling of votes without the need for this prohibition.[8]

As the district court observed, there are less restrictive alternatives available:

> [T]he state has an obviously less restrictive way to address any concern that images of completed ballots will be used to facilitate vote buying and voter coercion: it can simply make it unlawful to use an image of a completed ballot in connection with vote buying and voter coercion schemes.

Rideout, 123 F. Supp. 3d at 235; see also McCullen, 134 S. Ct. at 2539 ("[T]he Commonwealth has available to it a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate."). Indeed, as to narrow tailoring, the plaintiffs point

---

[8] Of course, another solution to New Hampshire's dilemma of not having a statute that criminalizes vote selling would be to enact such a statute.

to the language of the very limitation proposed by the minority of the House Criminal Justice Committee, but rejected by the majority of that Committee.   The ballot-selfie prohibition is like "burn[ing down] the house to roast the pig."  Butler v. Michigan, 352 U.S. 380, 383 (1957).

There are strong First Amendment interests held by the voters in the speech that this amendment prohibits.  As the Supreme Court has said, "[t]he use of illustrations or pictures . . . serves important communicative functions: it attracts the attention of the audience to the [speaker's] message, and it may also serve to impart information directly."  Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 647 (1985).

The restriction affects voters who are engaged in core political speech, an area highly protected by the First Amendment. As amici point out, there is an increased use of social media and ballot selfies in particular in service of political speech by voters.[9]  A ban on ballot selfies would suppress a large swath of

_____

[9]    Amicus Snapchat stresses that "younger voters participate in the political process and make their voices heard" through the use of ballot selfies.  According to the Pew Research Center, in the 2012 election, "22% of registered voters have let others know how they voted on a social networking site such as Facebook or Twitter," "30% of registered voters [were] encouraged to vote for [a particular candidate] by family and friends via posts on social media such as Facebook and Twitter," and "20% of registered voters have encouraged others to vote by posting on a social networking site."  Lee Raine, Pew Research Center, Social Media and Voting (Nov. 6, 2012), http://www.pewinternet.org/ 2012/11/06/social-media-and-voting/.

- 20 -

political speech, which "occupies the core of the protection afforded by the First Amendment," McIntyre, 514 U.S. at 346; see also Glik v. Cunniffe, 655 F.3d 78, 82 (1st Cir. 2011) (holding that there is a First Amendment interest in videotaping government officials performing their duties in public places). Ballot selfies have taken on a special communicative value: they both express support for a candidate and communicate that the voter has in fact given his or her vote to that candidate.

Section 659:35, I reaches and prohibits innocent political speech by voters unconnected to the State's interest in avoiding vote buying or voter intimidation. The plaintiffs' examples show plainly that section 659:35, I "burden[s] substantially more speech than is necessary to further the government's legitimate interests." McCullen, 134 S. Ct. at 2535 (quoting Ward, 491 U.S. at 799); see also McIntyre, 514 U.S. at 351 (holding that, despite legitimate interest in reducing fraud, government could not impose "extremely broad prohibition" on anonymous leafleting about ballot measures). Indeed, several states have now expressly authorized ballot selfies, and those states have not reported an uptick in vote buying or voter intimidation.[10]

---

[10] See A.B. 1494, 2015-16 Reg. Sess. (Cal. 2016) (enrolled Aug. 26, 2016) (amending statute to provide that "[a] voter may voluntarily disclose how he or she voted if that voluntary act does not violate any other law"); S.B. 1287, 52d Leg., 1st Reg.

New Hampshire may not impose such a broad restriction on speech by banning ballot selfies in order to combat an unsubstantiated and hypothetical danger.  We repeat the old adage: "a picture is worth a thousand words."

III.

The judgment of the district court is <u>affirmed</u>.

---

Sess. (Ariz. 2015) (making clear that there is no violation where "[a] voter . . . makes available an image of the voter's own ballot by posting on the internet or in some other electronic medium"); H.B. 72, Gen. Sess. (Utah 2015) (effective May 12, 2015) (amending statute to make clear that statute "does not prohibit an individual from transferring a photograph of the individual's own ballot in a manner that allows the photograph to be viewed by the individual or another"); S.B. 1504, 77th Or. Leg. Assemb., 2d Reg. Sess. (Or. 2014) (effective Jan. 1, 2015) (repealing language in statute that "[a] person may not show the person's own marked ballot to another person to reveal how it was marked"); H.P. 1122, 125th Leg., 1st. Reg. Sess. (Me. 2011) (repealing prohibition of showing a "marked ballot to another with the intent to reveal how that person voted"); R.I. State Bd. of Elections, ERLID No. 8372, Rules and Regulations for Polling Place Conduct (2016) (specifying that "[t]he electronic recording of specific vote(s) cast by another person is prohibited").